# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MARCE GONZALEZ, JR.**
Dyer, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ATHENA Y. COLLINS, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | )    No. 45A03-1104-CR-168 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Clarence D. Murray, Judge
Cause No. 45G02-0905-MR-3

**March 23, 2012**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Athena Y. Collins ("Collins") appeals from her conviction after a jury trial for voluntary manslaughter,[1] a Class A felony. Collins presents the following restated issues for our review:

I.      Whether the trial court erred in instructing the jury;

II.     Whether the trial court erred by admitting evidence of a prior out-of-state battery conviction from 1979; and

III.    Whether the prosecutor committed fundamental error by engaging in prosecutorial misconduct during closing arguments.

We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

On the morning of August 5, 2008, Collins and her husband, McKinley Collins ("McKinley"), received a telephone call from an automobile repair shop. McKinley had previously arranged to have Collins's car towed to have it repaired. The estimated cost of the repairs was between $500.00 and $700.00. After receiving the estimate, Collins and McKinley began to argue about their financial matters. The argument escalated and became physical. Next, either Collins hit McKinley with a clothes iron, or McKinley hit Collins with it, or both. At some point during the fracas in the hallway, Collins tore the control panel for the house alarm system from the wall and set off the alarm. The two continued to fight in the kitchen where McKinley grabbed a knife. McKinley used the knife to slash at Collins, cutting her several times on the arm and on her chest below her right breast.

Collins was able to break away from him and ran upstairs to retrieve a gun she had

_____
[1] *See* Ind. Code § 35-42-1-3.

2

purchased a few days after having obtained a protective order against McKinley in 2006. Collins ran back downstairs with the gun and found McKinley standing near the bathroom. Collins then shot McKinley five times, killing him.

After Collins set off the alarm, ADT, the alarm company, was notified of the alarm. A person working for ADT twice unsuccessfully attempted to reach Collins or McKinley on their telephone line. ADT then notified the Hammond Police Department and reported the alarm. After notifying the local police, ADT called Collins's son, who then spoke to his sister about the alarm.

Sergeant John Muta was dispatched to Collins's house in response to the residential alarm call. Sergeant Ray Finley also responded to the dispatch, and the two arrived at about the same time. Collins's daughter, Natasha Collins ("Natasha"), also arrived at the house at approximately the same time. The officers checked the exterior of the house for signs of forced entry because ADT had received an alert for broken glass, but found no such signs. Natasha, who was carrying a baby in her arms, approached the officers and asked what was happening. The three then proceeded to the front door of the house, and Natasha knocked on the door. Collins yelled from inside the house, "Go away. Everything is okay." *Tr.* at 365. Natasha opened the front door, which was unlocked. As she opened it, Collins told her, "[G]et the baby out of here." *Id*. at 428.

The officers went inside the home and found Collins sitting on a couch to the right of the front door, wearing a bloody house dress. Collins had a blank, expressionless look on her face, often described by officers as "a thousand-yard stare." *Id*. at 430. One of the officers

3

asked Collins if anyone else was in the house, to which Collins replied yes. She told them that she had a fight with her husband and shot him. She pointed to the rear of the house and said, "[O]ver there by the bathroom in the hallway." *Id*. at 368. Sergeant Muta turned and walked down the hallway where he found McKinley, nude and lying face down. McKinley, who was unresponsive and breathing shallowly, was lying halfway in the hallway and halfway in the bathroom, with a knife under his right hand. Sergeant Muta then called for backup and for an ambulance.

Sergeant Muta returned to the living room area and asked Collins for the location of the gun. Collins told him she had placed the gun on the table in the kitchen. Additional officers arrived and conducted a protective sweep of the remainder of the house. They found no one else inside the home. There were massive amounts of blood leading from the kitchen area to the bathroom area. The officers observed that Collins had a slashing-type wound on her lower arm and a few smaller wounds on her upper arm. Collins was also bleeding from her head above the left eye. McKinley was taken to a local hospital where he died a short time later of multiple gunshot wounds.

The State charged Collins with murder, a felony. At trial, the State advanced a theory that Collins had killed McKinley and then cut herself and pulled braids out of her head to make it appear as if she were the victim of domestic violence. Collins advanced the theory that she was the victim of more than twenty years of domestic violence at the hands of McKinley and that, on the morning of his death, she just snapped. In support of her argument, Collins presented evidence of Battered Woman Syndrome. She offered the

testimony of multiple witnesses that there had been numerous calls to the police over the years and complaints of domestic violence involving McKinley as the aggressor and Collins as the victim. Family members also testified that McKinley was the aggressor between the two. Over Collins's objection, the State presented rebuttal evidence that Collins had been arrested and charged in a battery incident in 1979 involving an alleged attack of a co-worker with a butcher knife, cutting the co-worker several times. At the conclusion of the jury trial, Collins was found guilty of voluntary manslaughter, and the trial court sentenced her to twenty-two years executed with two years suspended to probation. Collins now appeals. Additional facts will be supplied as needed.

## DISCUSSION AND DECISION

### I. Jury Instructions

Collins contends that the trial court erred in instructing the jury. She claims that the trial court erred by instructing the jury on voluntary manslaughter and by denying her tendered instruction on involuntary manslaughter.

The manner of instructing a jury lies largely within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of that discretion. *Stringer v. State*, 853 N.E.2d 543, 548 (Ind. Ct. App. 2006). An abuse of the trial court's discretion occurs "when 'the instructions as a whole mislead the jury as to the law in the case.'" *Ham v. State*, 826 N.E.2d 640, 641 (Ind. 2005) (quoting *Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002)). A defendant is only entitled to a reversal if he affirmatively demonstrates that the instructional error prejudiced his substantial rights. *Hero v. State*, 765 N.E.2d 599, 602 (Ind.

5

Ct. App. 2002). In reviewing a trial court's decision to give or refuse tendered jury instructions, we consider: "(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given." *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000).

When a trial court is requested to instruct a jury on a lesser included offense of the charged crime, the trial court conducts a tripartite analysis. *Wright v. State*, 658 N.E.2d 563, 566-67 (Ind. 1995). First, the trial court must compare the statutes defining the crime charged and the lesser included offense. *Id*. at 566. If the lesser included offense may be established by proof of the same material elements or less than all the material elements of the crime charged, or if the only difference is that a lesser culpability is required to establish the lesser included offense, then the lesser included offense is inherently included in the crime charged. *Id*. If the proffered lesser included offense is inherently included in the charged crime, then the trial court proceeds to the third step of the analysis. *Id*. at 566-67.

The trial court then proceeds to the second step of the analysis if the proposed lesser included offense is determined not to be inherently included in the crime charged under the first part of the analysis. *Id*. at 567. This second step involves a comparison of the statute defining the alleged lesser included offense with the charging information. *Id*. If the charging information alleges that the means used to commit the crime charged includes all of the elements of the lesser included offense, then the lesser included offense is factually included in the charged crime. *Id*. The trial court should then proceed to the third step of the

6

analysis. *Id.* If the alleged lesser included offense is neither inherently nor factually included in the crime charged, then the trial court should refuse to give the tendered instruction on the proposed lesser included offense instruction. *Id.*

Once the trial court determines that the lesser included offense is either factually or inherently included in the crime charged, the trial court must proceed to the third step of the analysis, examination of the evidence presented by both parties in the case. *Id.* If there is a serious evidentiary dispute about the elements distinguishing the lesser offense from the greater offense, and a jury could reach the conclusion that the lesser offense was committed, but not the greater, then the trial court commits reversible error by refusing to give the instruction on the inherently or factually included lesser offense. *Id.* However, if the evidence does not support the giving of the instruction on the inherently or factually included lesser offense, then the trial court should decline the tendered instruction. *Id.*

Here, the trial court instructed the jury on voluntary manslaughter. Voluntary manslaughter is an inherently included lesser offense of murder because proof of the same material elements is required. *Champlain v. State*, 681 N.E.2d 696, 701-02 (Ind. 1997); *compare* Ind. Code § 35-42-1-1 (murder) *with* Ind. Code § 35-42-1-3 (voluntary manslaughter). Voluntary manslaughter is a knowing or intentional killing committed while acting under sudden heat, a mitigating factor, but not an element of the crime. *Champlain*, 681 N.E.2d at 702. Sudden heat has been defined as "sufficient provocation to excite in the mind of the defendant such emotions as anger, rage, sudden resentment, or terror, and that such excited emotions may be sufficient to obscure the reason of an ordinary man." *Fox v.*

*State*, 506 N.E.2d 1090, 1093 (Ind. 1987). The trial court should instruct the jury on voluntary manslaughter "if there is any appreciable evidence of sudden heat." *Champlain*, 681 N.E.2d at 702 (quoting *Griffin v. State*, 644 N.E.2d 561, 563 (Ind. 1994)).

Although Collins argues otherwise, there is sufficient evidence from which the jury could conclude that Collins acted in sudden heat. Collins and McKinley argued about money on the morning of August 5, 2008. The argument escalated from a verbal argument to a physical assault. The two fought with each other in the hallway, then in the kitchen. McKinley picked up a knife and slashed Collins with the knife, cutting her several times. Collins then escaped from McKinley, ran upstairs, retrieved her gun, and shot McKinley as he continued to threaten to kill her and to curse at her. Collins told police in a voluntary statement given the day after the killing that she retrieved the gun because she thought McKinley was going to kill her. She stated that McKinley had abused her for years, but that this was the first time he had stabbed her. Although Collins stated that she thought she had shot McKinley twice, when told that McKinley suffered six gunshot wounds resulting from no fewer than three shots and likely five shots, she claimed she must have blacked out.

Collins relies on *Watts v. State*, 885 N.E.2d 1228 (Ind. 2008) to support her position that the trial court committed reversible error by giving the voluntary manslaughter instruction. However, *Watts* is factually distinguishable. In that case, there was no evidence of sudden heat, and that defendant's all-or-nothing strategy was thwarted by the option of a voluntary manslaughter conviction. *Id.* at 1233. There was evidence of sudden heat present in this case. The trial court did not abuse its discretion by giving this instruction.

8

Collins also claims that the trial court erred by refusing to give her tendered instruction on involuntary manslaughter. "Involuntary manslaughter is not an inherently included lesser offense of murder, but it may be a 'factually included' lesser offense" if the charging information alleges that a battery was the means of accomplishing the killing. *Wilson v. State*, 765 N.E.2d 1265, 1271 (Ind. 2002). "The only element distinguishing murder from involuntary manslaughter is what the defendant intended to do--batter or kill." *McEwen v. State*, 695 N.E.2d 79, 86 (Ind. 1998).

In the present case, there was no serious evidentiary dispute that Collins, by shooting McKinley several times, only intended to commit a battery. Collins presented evidence that McKinley was the aggressor and that she shot him in self-defense. She also introduced evidence regarding the Battered Woman Syndrome. When one shoots another person multiple times at close range, a reasonable jury could infer that the shooter's intent was to kill, not batter, the victim. Further, the charging information stated that Collins "knowingly or intentionally kill[ed] McKinley by means of a handgun." *Appellant's App.* at 17. The trial court did not abuse its discretion by refusing to give the tendered instruction on involuntary manslaughter.

## II. Admission of Evidence

Collins argues that the trial court erred by admitting Indiana Evidence Rule 404(b) evidence of an out-of-state battery charge brought against her in 1979. Indiana Evidence Rule 404(b) provides in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,

however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." The rule is designed to prevent the jury from assessing a defendant's present guilt on the basis of past propensities. *Hicks v. State*, 690 N.E.2d 215, 218 (Ind. 1997).

The admission or exclusion of evidence is entrusted to the discretion of the trial court. *Farris v. State*, 818 N.E.2d 63, 67 (Ind. Ct. App. 2004). We will reverse a trial court's decision only for an abuse of discretion. *Id.* We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Taylor v. State*, 891 N.E.2d 155, 158 (Ind. Ct. App. 2008). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.* In determining whether an error in the introduction of evidence affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury. *Oldham v. State*, 779 N.E.2d 1162, 1170 (Ind. Ct. App. 2002). Admission of evidence is harmless and is not grounds for reversal where the evidence is merely cumulative of other evidence admitted. *Pavey v. State*, 764 N.E.2d 692, 703 (Ind. Ct. App. 2002).

Our Supreme Court has stated the following regarding the admissibility of 404(b) evidence:

> [T]he standard for assessing the admissibility of 404(b) evidence in Indiana is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. When inquiring into relevance, the court may consider any factor it would ordinarily consider

10

under Rule 402. These may include the similarity and proximity in time of the prior bad act to the charged conduct, and will presumably typically include tying the act to the defendant. But these factors are simply illustrative of the many aspects that may, depending on the context, be required to show relevance.

*Hicks*, 690 N.E.2d at 221.

Here, the State introduced evidence of what it believed was Collins' prior misdemeanor conviction involving the use of a knife in the commission of a battery against a co-worker. In particular, the State introduced certified police records from Omaha, Nebraska that included a booking sheet, several pages of officer narratives, a rights advisory form, a fingerprint card, an order of release showing that the original felony charge had been dismissed, and a disposition of felony charges form that showed the felony charges against Collins had been dismissed, but that Collins had been rebooked with misdemeanor charges ("State's Exhibit 158"). Collins objected to the introduction of State's Exhibit 158 on the basis that there had been no sufficient notice of the State's intent to use the evidence and that the crimes were too old to qualify for admission under Indiana Evidence Rule 609. The trial court admitted the evidence, finding it to be relevant and not a surprise to Collins.

Assuming without deciding that Collins placed her character at issue, this evidence of a battery charge involving a co-worker, and not McKinley, made almost thirty years prior to the incident at issue, is not relevant or probative to the crime charged. Furthermore, the admission of such evidence can be highly prejudicial and lead to the forbidden inference of present guilt based upon prior propensities.

11

"Numerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime." *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004) (citing *Hicks*, 690 N.E.2d at 222; *Haggenjos v. State*, 441 N.E.2d 430, 431 (Ind. 1982)). Where a defendant claims self-defense, the State may use evidence of the defendant's prior misconduct to disprove that argument that the victim was the initial aggressor. *Perry v. State*, 956 N.E.2d 41, 59 (Ind. Ct. App. 2011). Before the alleged prior misconduct can be properly admitted for a permissible purpose under 404(b), however, there must be sufficient proof from which a jury could find that the defendant committed the acts. *Id.* "The relevant point, here, is that, where evidence of prior misconduct consists only of an arrest or charge, the fact of the arrest or charge alone will not suffice to sustain admission under Rules 404(b) and 104(b)." *Id*. at 60.

Here, Detective Stephen Guernsey ("Detective Guernsey") was allowed, over objection, to read from the documents contained in State's Exhibit 158. More specifically, Detective Guernsey testified that the 1979 incident occurred because Collins was upset that someone, a co-worker and not McKinley, had put sugar in the gas tank of her car and Collins believed she knew who had done so. He testified that Collins stated in the report that she became enraged at the victim, pulled a knife from her purse, and began cutting the victim with the knife. He further testified that Collins was having trouble with an ex-husband, also not McKinley, and put the knife in her purse because he had been bothering her. Detective

Guernsey testified on cross-examination that the certified documents did not contain the disposition of the case, so he could not testify with certainty if a conviction had been entered on those charges. This evidence was highly prejudicial to Collins and not harmless error. We conclude that the trial court abused its discretion in admitting the evidence of the 1979 battery arrest and charge.

### III. Prosecutorial Misconduct

Collins asserts that the prosecutor engaged in prosecutorial misconduct during closing arguments. When reviewing a claim of prosecutorial misconduct, we must first consider whether the prosecutor engaged in misconduct. *Williams v. State*, 724 N.E.2d 1070, 1080 (Ind. 2000). We then consider whether the alleged misconduct placed the defendant in a position of grave peril to which she should not have been subjected. *Id.* "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct." *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). "The gravity of the peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id.*

A prompt objection to alleged prosecutorial misconduct allows the trial court an opportunity to prevent or remedy any prejudice to a defendant without the waste of time and resources involved in the reversal of a conviction. *Etienne v. State*, 716 N.E.2d 457, 461 (Ind. 1999) (citing *Maldonado v. State*, 265 Ind. 492, 498, 355 N.E.2d 843, 848 (1976)). If a defendant does not object to the alleged misconduct, any claim of error is waived. *Id.* In addition to objecting to alleged misconduct, a defendant must also request an appropriate

13

remedy. *Id*. In general, the correct procedure involves a request for an admonishment. *Id*. If trial counsel is not satisfied that an admonishment will be sufficient to cure the error, then counsel may move for a mistrial. *Id*. The failure to request either an admonishment or mistrial results in waiver of the issue. *Id*.

Collins argues that even though there was no objection to the error, we may review the alleged misconduct under a fundamental error analysis. Fundamental error "must constitute a blatant violation of basic principles, the harm or potential harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Id*. at 462. (quoting *Wilson v. State*, 514 N.E.2d 282, 284 (Ind. 1987)). Fundamental error is error "so prejudicial to the rights of the defendant as to make a fair trial impossible." *Barany v. State*, 658 N.E.2d 60, 64 (Ind. 1995). "It is error that makes 'a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm.'" *Cooper*, 854 N.E.2d at 835 (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)).

Defense counsel's closing argument relating to the evidence of the 1979 charge, and the State's objection follow:

> Remember when I asked Detective Guernsey when did this occur? Well, I don't realty [sic] know. I think it was 1979. Okay. Was she ever convicted? I really don't know that either. But, you know, the certifieds are in. Well, read one of the last pages and it tell [sic] you, disposition, declined by the county attorney. What does that mean? This evidence, maybe there's a flaw. They didn't even prosecute. Where is the conviction? What is she convicted of? I don't know. There is no conviction.
>
> [THE STATE]: Judge, I'm going to object Counsel knows that that --very well that her client was convicted. It was reduced to a misdemeanor, and that

is contained within the psychiatric records as well as the other health records that we received.

[DEFENSE COUNSEL]: No, I disagree, your Honor, because as we had this discussion at the bench, I didn't know about this stuff until we walked in here, and this says cleared by arrest. And it says declined by the prosecutor. I do not know that to be a fact. And that's one of the reasons I objected to this evidence.

[THE COURT]: All right. Let's continue.

*Tr.* at 1638-39.

The prosecutor's statement that Collins's attorney knew that Collins had been convicted of the 1979 battery charge compounded the prejudice to her from the admission of State's Exhibit 158. The comment cast defense counsel in a derogatory fashion, portraying her as a liar, or at least suggesting that she was dishonest with the jury. In our view there is no question that the prosecutor's disparaging comments about defense counsel constituted prosecutorial misconduct. We remind counsel that disparaging opposing counsel seldom brings about good results.

There was nothing in the record to establish that Collins was in fact convicted of the charge or that defense counsel knew there was a conviction. Although the prosecutor admittedly was uncertain about whether there was a conviction, she was aware that there was no evidence introduced at trial to establish that there was in fact a conviction related to the 1979 charge. However, the State, by arguing that there was a conviction, impermissibly put that information before the jury during its argument.

Collins's defense to the murder charge was that she acted in self-defense and was a battered woman. The introduction of the evidence of the 1979 arrest and charge was highly

15

prejudicial to her defense. The State's comments disparaging defense counsel and mischaracterizing the evidence to reflect that Collins had a prior conviction presented an undeniable and substantial potential for harm. We believe that Collins has met her burden of establishing that fundamental error occurred here. Therefore, we reverse and remand for a new trial.

Affirmed in part, reversed in part, and remanded.

BARNES, J., and BRADFORD, J., concur.