**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHANDRA K. HEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| WILLIAM GAJDIK, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 15A05-1210-CR-539 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-1110-FA-24

**August 14, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

William Gajdik appeals from his conviction and sentence for Attempted Murder,[1] Burglary,[2] and Robbery.[3] He presents the following restated issues for our review:

1. Did the trial court abuse its discretion under Indiana Evidence Rule 404(b) by admitting evidence of prior bad acts?

2. Did the trial court abuse its discretion when imposing consecutive sentences?

3. Is Gajdik's sentence inappropriate in light of the nature of the offense and the character of the offender?

We affirm.

At approximately 6:30 a.m. on September 6, 2011, Thomas Jacobs (T.J.), a construction worker, went to the work shop behind his residence and began preparations for the work day. At around 8:30 a.m. when T.J. returned to his residence to pick up some paperwork, he noticed parked in his driveway an unfamiliar maroon Saturn vehicle that was still running. T.J., who had a truck for sale along the side of the road, surmised that a person had stopped to look at the truck. After walking down to the area where the truck was parked, he did not see anyone, and walked up his driveway. As he approached the front door of his residence, he noticed that it was open. T.J. thought that someone was breaking into his house, so he approached the Saturn, sat down in it, removed the keys from it, and placed the keys in his pocket.

---

[1] Ind. Code Ann. § 35-42-1-1 (West, Westlaw current with all 2013 legislation)(murder); Ind. Code Ann. § 35-41-5-1(West, Westlaw current with all 2013 legislation)(attempt).
[2] Ind. Code Ann. § 35-43-2-1 (West, Westlaw current with all 2013 legislation).
[3] Ind. Code Ann. § 35-42-5-1 (West, Westlaw current with all 2013 legislation).

T.J. then removed the keys from two other trucks that belonged to him and which were parked in front of his house. Preparing to defend himself, T.J. grabbed a hammer from one of his trucks and approached the front door of his house. Upon noticing that the mud-room door, which leads out the back of the house, was wide open, T.J. turned around and went back outside. As he was exiting the house, he saw an individual running down the sidewalk. That person entered the maroon Saturn and attempted to start the car. He was unsuccessful, however, because T.J. had the key to the Saturn in his pocket. The individual exited the vehicle and began running down the street, with T.J. in pursuit of him.

After the two had run nearly a quarter of a mile, the individual stopped, reached into a pillowcase that he was clutching in his hand, pulled out a Glock .357 SIG, and pointed it at T.J. Believing that the handgun appeared to be his, T.J. stopped, turned around, ran back into his residence and called the police. A pillowcase from one of the pillows in T.J.'s bedroom was missing. T.J. also discovered that his Glock .357 SIG handgun and ammunition, several pieces of T.J.'s wife's jewelry, and T.J.'s wallet, which had been left on his nightstand, were missing from the house.

Sergeants Mike Prudenti and Max Socks with the Aurora and Dearborn Police Departments responded to T.J.'s call. Upon arriving at T.J.'s house, Sergeant Prudenti observed the maroon Saturn parked in the driveway. T.J. informed the officers about the intruder and that after finding the intruder in the house had chased him south from his property. Sergeant Prudenti, who is a K-9 handler, used his canine to attempt to track the individual who burglarized T.J.'s residence. Although they searched around T.J.'s residence,

3

Sergeant Prudenti never saw the canine alert. Later, Deputy Ken McAllister of the Dearborn County Sheriff's Department arrived with his canine, Djardi, and that dog did not alert.

Between approximately 9:00 a.m. and 10:00 a.m., one of T.J.'s neighbors, William Pleiman, who was asleep in his residence, was awakened by the sound of a helicopter overhead. As he looked out the front window of his home for the helicopter, Pleiman noticed a person wearing white pants run across his backyard from east to west. A moment later, Pleiman noticed the same man standing on Pleiman's patio. Because Pleiman's three dogs began barking, Pleiman stepped out of the house onto his patio. When Pleiman asked the man if he could assist him with anything, the man responded that his car had broken down. Pleiman told the man the location of a nearby mechanic. The man proceeded in that direction and Pleiman continued with his usual activities.

Between 11:30 a.m. and noon that same day, Corey Hester, another of T.J.'s neighbors, heard a knock on his front door. When Hester answered the door, he found a man who was out of breath and sweating, and who indicated that his car had broken down. Hester peered out his front door, but did not see a car there. The man asked Hester for a glass of water. Hester gave him a bottle of water, shut the door, and said "have a nice day." *Transcript* at 514. Five minutes later Hester did not see the man anywhere in the neighborhood. After Hester notified police, Sergeant Prudenti responded to Hester's report with his canine, however, the dog did not alert.

Robert Tibbits arrived home from work between 3:30 p.m. and 4:00 p.m. When he opened his front door, he noticed a shadow in the hallway. A man then emerged from the

4

hallway with a revolver in his hand. Tibbits turned to run out of the house when the man fired the revolver. The bullet struck Tibbits in his lower back and the impact pushed him out onto his front porch. The man approached Tibbits, who lay on the ground, rolled Tibbits onto his back, and pointed a gun in Tibbits's face. The man used profanity in his demand to have Tibbits surrender his car keys. Tibbits still had the car keys to his black Thunderbird in his hand. He extended his arm and the man took the keys from Tibbits's hand. The man left Tibbits's home, entered Tibbits's vehicle, and drove away.

Tibbits, who remained on the ground, reached behind his back to assess his injuries and realized that his hand was full of blood. Tibbits then reached for his cell phone to call 911, but his hands were shaking and he was unable to complete the call. Tibbits yelled for help.

After a few moments, Angela Moore, who had been visiting her brother at his house down the street from Tibbits's house, observed Tibbits's Thunderbird drive past her brother's house. Moore then heard someone yelling for help, and ran toward the location of the screams to find the person needing assistance. Moore found Tibbits on his patio yelling for help. When Moore asked Tibbits what had happened, he told her that he was shot and asked her to dial 911. Moore and her brother, Duane Wilson, who had also run to assist the person screaming, each attempted to call 911, but were unsuccessful due to poor cell phone service. Crystal Wilson, Duane Wilson's daughter, eventually called 911. Moore entered Tibbits's residence and grabbed a towel to put on Tibbits's back while waiting for police officers to arrive. Moore stayed with Tibbits until officers arrived.

5

When Sergeant Socks arrived at Tibbits's residence he observed Tibbits lying on the ground outside of his house. He approached Tibbits and asked if he could describe the perpetrator. While Sergeant Socks was speaking with Tibbits at approximately 4:00 p.m., EMTs Tom Stevens, Josh Snapp, and Tim Bill responded to the call to assist Tibbits. Bill immediately administered oxygen to Tibbits and upon examination of him saw a significant amount of blood seeping from Tibbits's back. Bill instructed Stevens to contact air care.

Bill further examined Tibbits and discovered a bullet lodged in Tibbits's stomach that was visible just beneath Tibbits's skin. The three EMTs loaded Tibbits onto a cot and into the ambulance. Stevens drove the ambulance to the air care landing area, which was approximately one mile away, where they met EMT Dennis Schmidt. Schmidt inserted an intravenous line into Tibbits, who was then loaded onto the helicopter and transported to the University of Cincinnati Hospital.

Upon his arrival at the hospital, Tibbits's pain level was rated ten out of ten, his shock level was grade two to three out of four grades, and due to the nature of the injuries, Tibbits was immediately taken to surgery. Dr. Kevin Kasten treated Tibbits for his wound. During Tibbits's initial surgery Dr. Kasten removed two pieces of the bullet in Tibbits's abdomen. The bullet fragments were later identified as parts of a bullet which could have been fired from the Glock .357 SIG stolen from T.J.'s residence. Doctors were able to only partially repair Tibbits's abdomen before they had to partially close his wound, allow Tibbits time to heal, and attempt to completely close the surgical wound at a later date.

Tibbits was in the hospital for a month during which time he underwent seven surgeries to repair his abdomen. Tibbits injuries were such that sections of his small bowel, colon, small intestine, and large intestine had to be removed to repair the physical damage caused by the bullet. According to Dr. Kasten, the bullet's path narrowly missed Tibbits's aorta, and that if the aorta had been damaged, the injury would have killed Tibbits quickly. A large amount of muscle had to be removed from Tibbits and his abdomen had to be covered with a skin graft, leaving only a thin layer of skin to protect Tibbits's internal organs.

Tibbits was in the Intensive Care Unit of the hospital for the duration of his stay there. He was released to a rehabilitation center. Dr. Kasten considered Tibbits's injuries to be life threatening and that the pain level produced by his injuries would have been extremely high. Tibbits will have to undergo future surgeries. After Tibbits was able to return home, he observed that $700.00 was missing from his residence.

Dearborn County Sheriff's Department Detectives Carl Pieczonka and Shane McHenry executed a search warrant on the Saturn vehicle that was abandoned at T.J.'s residence. On the front passenger side of the car, Detective Pieczonka discovered an AAMCO transmission receipt from R.A. Wolfe Enterprises in Alpha, Ohio. The receipt was dated September 2, 2011, or four days before the crimes that are the subject of this appeal occurred, and bore the signature William Gajdik. Other items discovered during the execution of the search warrant were passport photographs, a road atlas opened to show the State of Indiana, and a cigarette lighter. There was also evidence of internet research to

execute a plan to change identity. Police later determined that Gajdik's fingerprints were on the atlas, the receipt, and the cigarette lighter.

Following up on the name that was on the receipt, Detective McHenry obtained a copy of a driver's license photo of William Gajdik from the Rising Sun Police Department. Detective McHenry showed the photograph to T.J., who identified Gajdik as the individual who robbed and confronted him. Detective McHenry also contacted Tom Porrazzo at AAMCO transmission. Porrazzo told Detective McHenry that he was the one who had waited on the individual who had brought the Saturn in for repair. Detective McHenry emailed a copy of the driver's license to Porrazzo, who identified Gajdik as the person who brought the Saturn in for repair.

Further investigation led Detective McHenry to discover an article from a newspaper in Illinois published on August 11, 2011, approximately one month before Gajdik shot Tibbits. The article made reference to an individual named William Gajdik, who had walked away from a Corrections Facility in Lincoln, Nebraska on July 29, 2011. According to the account in the article, Gajdik had been seen in Peoria, Illinois where he had stolen a maroon four-door Saturn from Advantage AutoSale in Peoria. When Detective McHenry contacted Advantage AutoSale he was advised that Gajdik had provided a photocopy of his driver's license, taken the Saturn on a test drive, and had not returned the vehicle.

Detective McHenry learned that Gajdik was staying at the Riverside Inn in Lawrenceburg, Indiana. Detective McHenry went to the Riverside Inn and obtained a receipt

8

showing that Gajdik had stayed there from September 5, 2011 to September 6, 2011. The address provided on the receipt was 2720 West VanDoren, Lincoln, Nebraska, 68522.

On September 13, 2011, Detective John Vance of the Dearborn County Sheriff's Department received a report from police in Bettendorf, Iowa regarding a stolen vehicle. The reported indicated that the vehicle had been taken from a car lot by an individual who left a driver's license bearing the name Gajdik. Dana Gillam, an employee at Bettendorf Auto Sales, testified at trial that Gajdik arrived at the car dealership in a taxi, walked around the lot for a while, and eventually asked to test drive a Chevrolet Cavalier. Gajdik complied with the requirement that he leave a photocopy of his driver's license with the dealership. After returning from the test drive, Gajdik asked if he could take the car to have his mechanic look at it. Gajdik drove away and never returned the vehicle. Detective Vance obtained surveillance footage from the Bettendorf Auto Sale security cameras, which confirmed Gillam's version of events.

On September 16, 2011, Detective Vance received a teletype transmission informing him that Tibbits's Thunderbird had been located at a Target store in Davenport, Iowa. The Target store where Tibbits's vehicle was found was approximately six miles away from Bettendorf Auto Sale. Detective Douglas Adams with the Davenport Police Department was the first to locate Tibbits's Thunderbird in the parking lot. Further investigation revealed Gajdik's fingerprints inside of the Thunderbird, and DNA consistent with Gajdik's on the gear shift knob of the vehicle.

9

Later, Detective McHenry received information from police officers in Fargo, North Dakota that Gajdik was in the area. Officer Kyle Bergren from the Fergus Falls Police Department had received information that Gajdik was in Fargo, North Dakota on October 3, 2011. He and Sergeant Conrad later observed, in the lot of a Super 8 Motel a Chevrolet Cavalier that matched information they had received from police in Fargo. Officer Bergren and Sergeant Conrad spoke with the hotel clerk, who verified that Gajdik was staying at the hotel in room 240.

As they began walking up the stairs to that room, Gajdik passed Officer Bergren and Sergeant Conrad. They allowed him to pass and then informed other officers located on the perimeter that Gajdik was outside. A few moments later, Gajdik returned to his room, put his key in the door lock, and was apprehended by police officers before he could open the door.

Officer Bergren confirmed that the Chevrolet Cavalier in the parking lot was the same one that was stolen from Bettendorf Auto Sale and obtained a search warrant for both the motel room and the car. Inside Gajdik's motel room police recovered $800.00 in cash. In the car, police recovered T.J.'s Glock .357 SIG. DNA on the pistol was consistent with Gajdik's DNA. Andy Miller from the Fergus Falls Police Department in North Dakota contacted Detective McHenry and informed him of Gajdik's arrest there. Gajdik later confessed to the commission of the crimes.

The State proceeded to trial on the charges alleging attempted murder of Tibbits, burglary of Tibbits causing bodily injury, robbery of Tibbits causing serious bodily injury, burglary of T.J., robbery of T.J. while armed with a deadly weapon, and habitual offender

10

enhancement. Prior to trial, the State notified the trial court and the defense that the State intended to introduce evidence of Gajdik's escape from a Nebraska Community Corrections center, and evidence recovered from stolen vehicles linking Gajdik to the charged offenses. Gajdik objected to the evidence, but the trial court issued an order allowing the admission of evidence relating to Gajdik's escape, and evidence discovered in the Saturn, Tibbits's Thunderbird, and the Chevrolet Cavalier.

At the conclusion of his trial, the jury found Gajdik guilty on all charges and found Gajdik to be a habitual offender. Due to double jeopardy concerns, the trial court reduced the count alleging burglary causing serious bodily injury to burglary as a class B felony. The count alleging robbery causing serious bodily injury was reduced to robbery as a class C felony. The trial court then sentenced Gajdik to fifty years on Count I for his attempted murder conviction, twenty years on Count II for his burglary conviction, eight years on Count III for his robbery conviction, twenty years on Count IV for his burglary conviction, twenty years on Count V for his robbery conviction, and enhanced Gajdik's attempted murder conviction by thirty years based on his status as a habitual offender. The trial court ordered the sentences to be served consecutively in the Department of Correction for an aggregate sentence of 148 years. Gajdik now appeals.

1.

Gajdik claims that the trial court abused its discretion under Ind. Evid. R. 404(b) when it admitted the evidence of Gajdik's escape from community corrections, and evidence discovered in stolen vehicles connecting Gajdik to the offenses at issue here. The State

contends that the evidence was intrinsic evidence of other acts and was not unfairly prejudicial. The State contends in the alternative that even if the evidence falls under Rule 404(b) it was admissible evidence of motive, plan, and identity. Further, the State claims that if the evidence was erroneously admitted, the admission of the evidence was harmless in light of Gajdik's confession to the crimes. The trial court found that the evidence of the escape from prison in Nebraska, the car thefts, the information on how to change one's identity, the cash found in the motel room, as well as the discovery of T.J.'s gun found in the car Gajdik was driving at the time of his arrest, were all relevant to the matter at issue.

Evid. R. 404(b) provides in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." The rule "is designed to prevent a jury from assessing a defendant's present guilt on the basis of his past propensities, the so called 'forbidden inference.'" *Hicks v. State*, 690 N.E.2d 215, 218-19 (Ind. 1997).

Generally speaking, the admission or exclusion of evidence is entrusted to the discretion of the trial court. *Collins v. State*, 966 N.E.2d 96 (Ind. Ct. App. 2012). A trial court's decision will be reversed only for an abuse of discretion, which occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or when it misinterprets the law. *Id.* On review, we consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to

12

the defendant. *Id*. In our review of whether the introduction of evidence affected a defendant's substantial rights, we assess the probable impact of the evidence on the jury. *Id*. The erroneous admission of evidence is harmless and not reversible error where the evidence is merely cumulative of other evidence properly admitted. *Id*.

Assuming without deciding that the challenged evidence of uncharged crimes is intrinsic, we turn our analysis to Rule 404(b). For purposes of reviewing the admissibility of alleged Rule 404(b) evidence our standard of review has been stated as follows:

> [T]he standard for assessing the admissibility of 404(b) evidence in Indiana is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. When inquiring into relevance, the court may consider any factor it would ordinarily consider under Rule 402. These may include the similarity and proximity in time of the prior bad act to the charged conduct, and will presumably typically include tying the act to the defendant. But these factors are simply illustrative of the many aspects that may, depending on the context, be required to show relevance.

*Hicks v. State*, 690 N.E.2d 215, 218 (Ind. 1997). We agree that the evidence is relevant to the charged offenses and that the probative value outweighed the prejudicial effect. But even if we were to find the evidence inadmissible under Rule 404(b), Gajdik has failed to establish reversible error.

Errors in admitting evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. *Turben v. State*, 726 N.E.2d 1245 (Ind. 2000); Ind. Trial Rule 61. On review, we must assess the probable impact of that evidence upon the jury to determine whether the introduction of the evidence affected the appellant's substantial rights.

13

*Rawley v. State*, 724 N.E.2d 1087 (Ind. 2000). We will not reverse the conviction if the State can demonstrate beyond a reasonable doubt that the alleged error did not contribute to the verdict. *Hughley v. State*, 737 N.E.2d 420 (Ind. Ct. App. 2000). Where the State presents evidence of guilt that is overwhelming and independent of the challenged evidence, the error is harmless and reversal is not warranted. *Turben v. State*, 726 N.E.2d 1245.

After Gajdik was apprehended in Fargo, Detective Garland Bridges of the Dearborn County Sheriff's Office took a statement from Gajdik during which Gajdik confessed to the crimes. Detective Bridges testified without objection about how police officers were able to determine that Gajdik was the person who committed the crimes. That testimony included references to the evidence recovered from the maroon Saturn, Tibbits's Thunderbird, and the Chevrolet Cavalier. The admission of the evidence, if erroneous, was harmless error in light of Gajdik's confession and Detective Bridges's testimony. *See Houser v. State*, 823 N.E.2d 693 (Ind. 2005) (admission of bad act evidence is harmless error where defendant admitted to offenses and independent evidence implicated that he committed the offenses). Gajdik has failed to establish reversible error.

2.

Gajdik claims that the trial court abused its discretion by ordering that his sentences be served consecutively. He contends that the nature of his crimes was episodic such that Counts I, II, and III should be served concurrently and that Counts IV and V should be served concurrently. Although the trial court was statutorily entitled to order the sentences to be

14

served consecutively, Gajdik argues that the decision to impose consecutive sentences was an abuse of discretion.

The trial court's decision to impose consecutive or concurrent sentences is reviewed for an abuse of discretion. *Gellenbeck v. State*, 918 N.E.2d 706 (Ind. Ct. App. 2009). A trial court is required to state its reasons for imposing consecutive sentences, and is allowed to rely on the same reasons for imposing a maximum sentence and consecutive sentences. *Id.* Gajdik appears to argue that the trial court abused its discretion by ordering the sentences to be served consecutively when they constituted a single episode of criminal conduct.

Ind. Code Ann. § 35-50-1-2(c) (West, Westlaw current with all 2013 legislation), provides that sentences for convictions arising from a single episode of criminal conduct shall not exceed the advisory sentence for a felony that is one class higher than that of the most serious of the felony convictions. The statute places certain limitations on the duration of consecutive sentences. *Davies v. State*, 758 N.E.2d 981 (Ind. Ct. App. 2001). The statutory limitation does not apply, however, if the person commits crimes of violence. I.C. § 35-50-1-2(a), (c). All but one of Gajdik's convictions, the class C felony robbery conviction, are defined by statute as crimes of violence.

In *Ellis v. State*, 736 N.E.2d 731 (Ind. 2000), our Supreme Court decided the issue presented here. The sentencing limitation does not apply where there is consecutive sentencing between conviction for crimes of violence and a conviction for a crime that is not a crime of violence. *Id.* The trial court did not abuse its discretion in sentencing Gajdik because the sentencing limitation was not triggered. Furthermore, the trial court found the

significant harm to the victims was an aggravating circumstance. A single aggravating circumstance finding support in the record may be used both to enhance a sentence and to support the imposition of consecutive sentences. *Davies v. State*, 758 N.E.2d 981 (Ind. Ct. App. 2001).

3.

Gajdik further argues that his consecutive sentences are inappropriate in light of the nature of the offenses and the character of the offender. Appellate courts may revise a sentence after careful review of the trial court's decision if they conclude that the sentence is inappropriate based on the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Even if the trial court followed the appropriate procedure in arriving at its sentence, the appellate court still maintains a constitutional power to revise a sentence it finds inappropriate. *Hope v. State*, 834 N.E.2d 713 (Ind. Ct. App. 2005). The defendant has the burden of persuading the appellate court that his sentence is inappropriate. *King v. State*, 894 N.E.2d 265 (Ind. Ct. App. 2008).

To the extent Gajdik appears to argue that the consecutive sentences render the aggregate sentence inappropriate, we decline to engage in that analysis here. Under an inappropriate sentence analysis, we review the aggregate sentence rather than whether the sentences are to be served consecutively or concurrently, the number or counts, or the length of the sentence on any one count. *Gleason v. State*, 965 N.E.2d 702 (Ind. Ct. App. 2012). Review of the propriety of consecutive sentences is conducted under an abuse of discretion

16

standard. *Gellenbeck v. State*, 918 N.E.2d 706. Having already determined that the trial court did not abuse its discretion, we turn to the analysis required here.

As for the nature of the offenses and Gajdik's character, we observe that he went on a crime spree through Indiana during which he committed crimes against multiple victims during the daylight hours without fear of detection. After robbing T.J. of his handgun, Gajdik threatened T.J. with his own weapon. Tibbits has endured and will continue to endure throughout his lifetime medical, physical, and mental damage. All but one of Gajdik's convictions are for crimes of violence. Additionally, Gajdik's criminal history consists of twenty-five felony convictions and pending felony charges in Illinois, Iowa, and Nebraska. Gajdik has failed to meet his burden of persuading us that his sentence is inappropriate in light of the nature of the offenses and the character of the offender.

Judgment affirmed.

BAKER, J., and VAIDIK, J., concur.