**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 10 2013, 9:35 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARCE GONZALEZ, JR.**
Dyer, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| AARON EDWARD BELCHER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A05-1305-CR-225 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Salvador Vasquez, Judge
Cause No. 45G01-1105-FB-54

**December 10, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Aaron E. Belcher (Belcher), appeals his conviction for Count I, burglary, a Class B felony, Ind. Code § 35-43-2-1(1)(B)(i); Count II, escape, a Class C felony, I.C. § 35-44-3-5(a); Count IV, confinement, a Class D felony, I.C. § 35-42-3-3(b)(1)(A); Count V, possession of a narcotic drug, a Class D felony, I.C. § 35-48-4-6(a); Count VI, resisting law enforcement, a Class A misdemeanor, I.C. § 35-44-3-3(a)(3); and Count VIII, possession of marijuana, a Class A misdemeanor, I.C. § 35-48-4-11(1).

We affirm.

## ISSUE

Belcher raises one issue on appeal, which we restate as: Whether the State committed prosecutorial misconduct during its closing argument that caused fundamental error depriving Belcher of a fair trial.

## FACTS AND PROCEDURAL HISTORY

On May 29, 2011, Indiana State Trooper and Canine Officer Ricky Rayner (Trooper Rayner) spotted a 2005 Mercury Mariner SUV parked on the shoulder of a ramp leading onto Interstate 65 in Hobart, Indiana. Noting the apparent incongruity between the vehicle's active tail lights and the presence of daylight outside, Trooper Rayner stopped to investigate. When he approached the driver side door, Trooper Rayner observed Belcher behind the wheel with his head back and eyes closed. A needle, spoon, and piece of cotton were visible on the passenger seat. Trooper Rayner tapped on the

2

driver side window in an effort to rouse Belcher. When this failed, Trooper Rayner activated his vehicle's video camera and obtained a flashlight before returning to the SUV to try again.

Upon opening the vehicle's driver side door, Trooper Rayner noticed a strong odor of marijuana and saw a green leafy substance wrapped in white paper tucked into the door handle. After unsuccessfully attempting to wake Belcher with shoulder shakes and sternum rubs, Trooper Rayner called for an ambulance. When Belcher regained consciousness, he had difficulty answering questions, and his eyes appeared to roll involuntarily in his head as he spoke. Once the EMTs arrived, Trooper Rayner took Belcher to the ambulance. While Trooper Rayner performed a search of the SUV, Belcher became increasingly agitated during the course of his medical examination. Belcher exited the ambulance, returned to his vehicle (which Trooper Rayner was still in the process of searching), and sat in the driver seat.

Trooper Rayner ordered Belcher out of the car and arrested him. He cuffed his hands behind his back, sat him in the passenger seat of his patrol car, and fastened the seatbelt around him. Trooper Rayner's canine partner was still caged in the back seat. Belcher's agitation escalated, and Trooper Rayner had to return to the patrol car several times to refasten Belcher's seatbelt. Belcher eventually unbuckled the seatbelt, opened the passenger door, and fled to a nearby residential area. Trooper Rayner and his canine partner followed.

Still handcuffed, Belcher jumped a fence and entered the front door of the home of Inger Rongstad (Rongstad). Trooper Rayner tied his canine partner to a fence to avoid injuries to bystanders and continued pursuit. Inside the home, Rongstad was in the living room watching television with her twelve-year-old daughter. Rongstad's seventeen-year-old son was in his bedroom. When Belcher entered, he immediately closed the door and used his body to hold it shut. Rongstad ordered Belcher to leave, but when she tried to force him back out the front door, he closed the door again and managed to lock it. Trooper Rayner subsequently kicked in the door.

Belcher ran through the house, unlocked the back door, and continued to flee with Trooper Rayner in pursuit. As he exited the house, Belcher slipped and fell to the ground. He then continued to resist by kicking Trooper Rayner. Once he was back in custody, Belcher was again examined by the EMTs, who checked his blood sugar and gave him a drug to counteract the effects of opiates. Belcher was transported to the hospital and cleared to be taken to the Lake County Jail.

On May 31, 2011, the State filed an Information which was amended on August 17, 2011, and charged Belcher with Count I, burglary, a Class B felony, Ind. Code § 35-43-2-1; Count II, escape, a Class C felony, I.C. § 35-44-3-5; Count III, confinement, a Class C felony, I.C. § 35-42-3-3; Count IV, confinement, a Class D felony, I.C. § 35-42-3-3; Count V, confinement, a Class D felony, I.C. § 35-42-3-3; Count VI, possession of a narcotic drug, a Class D felony, I.C. § 35-48-4-6; Count VII, resisting law enforcement, a Class D felony, I.C. § 35-44-3-3; Count VIII, resisting law enforcement, a Class D

4

felony, I.C. § 35-44-3-3; Count IX, possession of marijuana, a Class A misdemeanor, I.C. § 35-48-4-11; Count X, operating while intoxicated, a Class C misdemeanor, I.C. § 9-30-5-1; and Count XI, operating a motor vehicle while intoxicated, a Class C misdemeanor, I.C. § 9-30-5-2.

On March 7, 2013, the State dismissed one Count of confinement as a Class D felony and both Counts of operating while intoxicated as a Class C felony. On March 11-13, 2013, a jury trial was held. The jury acquitted Belcher of confinement as a Class C felony and resisting law enforcement as a Class D felony, and returned a guilty verdict on all other Counts. On April 11, 2013, the trial court sentenced Belcher to ten years for burglary, one-and-a-half years for possession of a narcotic drug, and one year each for resisting law enforcement and possession of marijuana. Based on double jeopardy and merger doctrines, judgment was vacated on escape and criminal confinement. The trial court ordered that Belcher's sentences be served concurrently at the Department of Corrections for an aggregate term of ten years.

Belcher now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Belcher contends that the State committed prosecutorial misconduct causing fundamental error, thus depriving him of a fair trial. In reviewing a prosecutorial misconduct claim, this court employs a two-step analysis, the first of which determines whether the prosecutor engaged in the alleged misconduct. *Wine v. State*, 637 N.E.2d 1369, 1376 (Ind. Ct. App. 1994). If the court finds misconduct, it must then consider all

the circumstances of the case and decide if the misconduct placed the defendant in grave peril to which he should not have been subjected. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of the impropriety of the conduct." *Id*.

At trial, Belcher failed to preserve a claim of prosecutorial misconduct. To properly preserve such a claim, he should have contemporaneously objected to the allegedly improper conduct and requested that the trial court admonish the jury. *Id*. Failure to raise the issue at trial results in its waiver. *Id*. Where a claim of prosecutorial misconduct has not been properly preserved, the standard of review places a greater evidentiary burden on the appellant. *Id*. In addition to establishing the grounds for the misconduct, Belcher must also demonstrate that it rose to the level of fundamental error. *Id*. "In order to qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Willey v. State*, 712 N.E.2d 434, 444-45 (Ind. 1999). A fundamental error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Wilson v. State*, 514 N.E.2d 282, 284 (Ind. 1987).

Here, Belcher alleges three separate instances of prosecutorial misconduct, all involving improper statements made to the jury during closing argument. The first of

6

these contested statements occurred during the initial portion of the State's closing argument:

> I would also like to talk to you about an instruction you're going to get. It's called duress. In [defense counsel]'s opening statement, he made reference to [Belcher]'s fear of the dog and that's why he ran. Now, [Belcher] has chosen not to testify and he has his right to do that. Every defendant does. But I would like to put out in front of you, ladies and gentlemen, we have no evidence of what [Belcher] himself was thinking.

(Transcript p. 231). Belcher contends that these remarks directly and inappropriately referred to his exercise of his right against self-incrimination.

While the State did mention Belcher's decision not to testify, it did so only to respond to arguments raised previously by defense counsel. "If in its totality the prosecutor's comment is addressed to other evidence rather than the defendant's failure to testify, it is not grounds for reversal." *Hill v. State*, 517 N.E.2d 784, 789 (Ind. 1988). "Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Dumas v. State*, 803 N.E.2d 1113, 1118 (Ind. 2004).

During opening statements, defense counsel declared, "When [Belcher] was standing outside of the car, this dog was sicked (sic) on him." (Tr. pp. 22-23). In its closing argument, the State was attempting to rebut defense counsel's assertion that Belcher did not actively choose to flee law enforcement, but was instinctually compelled to enter "into survival mode" by an overwhelming fear of Trooper Rayner's canine partner. (Tr. p. 23). No evidence supports the contention that Belcher was "standing" when the canine "was sicked (sic) on him," and likewise, nothing in the record

demonstrates how Belcher felt about the dog. "Comment on the lack of evidence by the defense concerning otherwise incriminating evidence against him is proper as long as the State focuses on the absence of any evidence to contradict the State's evidence and not on the accused's failure to testify." *Martinez v. State*, 549 N.E.2d 1026, 1028 (Ind. 1990). Here, the State was emphasizing that defense counsel's claim regarding Belcher's reason for flight was unsubstantiated, not that Belcher had declined to testify. Considered in context, we conclude that this portion of the State's closing argument did not constitute misconduct.

After highlighting the lack of evidence supporting defense counsel's description of events, the State attempted a further rebuttal with a counter-narrative detailing the canine's participation in the arrest. Belcher now questions the legitimacy of the following passage:

> The only time this dog thing comes out is after [Belcher] . . . gets . . . a lawyer and this lawyer reviews the file and he sees the EMT report . . . [Belcher]'s blood sugar was fine . . . Now I got this footage showing that my client is now running and it's gonna be seen by the jury. Well, that defense isn't gonna work anymore because now they're gonna see what actually happened. Now, let's make up a story about the dog. Somebody made up a story, and it wasn't . . . Belcher.

(Tr. pp. 258-59). Belcher maintains that this language—specifically the last two sentences—must be construed as clearly (if indirectly) denigrating remarks designed to portray defense counsel as a liar.

Belcher correctly points out that this court recently decided a case where a prosecutor's disparaging comments accusing defense counsel of dishonesty did constitute

8

error. *See Collins v. State*, 966 N.E.2d 96 (2012). That case, however, involved the State's improper introduction of highly prejudicial evidence. The State then compounded its error when it responded to defense counsel's objection with accusations of duplicity regarding the nature and content of the contested evidence. *Id.* at 106, 107. "The State's comments disparaging defense counsel and mischaracterizing the evidence to reflect that Collins had a prior conviction presented an undeniable and substantial potential for harm," and thus constituted fundamental error. *Id.* at 107. Belcher's case is distinguishable as it presents no improper admission of highly prejudicial evidence and no analogous compounding of errors by the State.

Furthermore, this particular line of argument by the State did not focus on deceit, but on critically examining the canine's level of involvement in Belcher's arrest, flight, and re-apprehension. Defense counsel said explicitly during its closing argument that Trooper Rayner "wanted [Belcher] to run. He absolutely did. [Trooper Rayner] went through three months' worth of training . . . never had a police dog chase." (Tr. p. 234). The State countered with the following points: (1) Belcher gave no verbal or physical suggestions to either Trooper Rayner or the attending EMTs that he was concerned about the dog; (2) video footage of Belcher in Trooper Rayner's car with the canine in the back seat does not appear to indicate that Belcher was frightened of the dog; (3) following Belcher's flight from Trooper Rayner's car, a series of delays prevented the canine from ever being within striking distance of Belcher. The State's line of reasoning was designed to present the jury with two irreconcilable accounts and suggest that only one

was plausible. Read in context, the State's allegedly disparaging remarks amount to little more than conclusory asides.

The final statement with which Belcher takes issue is more problematic. The video camera that Trooper Rayner had activated prior to waking Belcher recorded Trooper Rayner expressing to another officer on the scene his hope that Belcher would run. The fact that Trooper Rayner said the words is undisputed, so each party questioned what the words meant. Defense counsel argued vigorously that the recorded statement should be taken literally, while Trooper Rayner testified that he "was being facetious" and did not actually want Belcher to flee from custody. (Tr. p. 110). Defense counsel claimed that the controversial statement was intended seriously, while the State asserted it was not. In its closing argument, the State addressed this point with the following:

> And to say that [Trooper Rayner] wanted to use his dog—oh, really? So this trooper gets his kicks by handcuffing people, putting them in his car, strapping them in and telling them not to leave three times. He was hoping that . . . Belcher was Houdini. This is serious. And all joking aside. This trooper takes his job seriously—not only as a trooper, but [as] a canine officer. Every day he goes on shift, he puts his life on the line. He doesn't know what's gonna happen when he comes up to that car. He doesn't know what he's gonna find or what is inside the car, but he does it every day. And he takes it very seriously. He told you about all the training his dog goes through, all the training he goes through. This is not a joke—at least it's not a joke to this trooper. [Defense counsel] seems to think that this is just hilarious, though.

(Tr. p. 263). Considering the context, the State's argument seems particularly inapt.

After explicitly contending that Trooper Rayner's statement was not serious, the State attempted to bolster its argument by asserting how seriously Trooper Rayner had taken the situation. Conversely, the State strongly implied that defense counsel's

argument about the seriousness of Trooper Rayner's statement should be considered frivolous.  The State unconvincingly argued that it was serious about Trooper Rayner making a joke, whereas defense counsel was joking about Trooper Rayner being serious.  Additionally, it is unclear from the record why the State suggested that defense counsel thought the situation "hilarious."  (Tr. p. 263).

Nevertheless, even if this last instance did constitute prosecutorial misconduct, we conclude that it did not rise to the level of fundamental error.  In *Owens v. State*, 937 N.E.2d 880 (Ind. Ct. App. 2010), we found no fundamental error in spite of improper statements made by the prosecutor.  *Id.* at 894.  That decision emphasized both "the narrow applicability of the fundamental error doctrine," as well as the "isolated" nature of the prosecutorial statements in question.  *Id.*  We conclude that the State's remarks did not place Belcher in grave peril to which he should not have been subjected, and that the probable persuasive effect of one potentially improper statement delivered in the middle of a closing argument is relatively small.  Moreover, the jury was presented with ample evidence of Belcher's guilt, including drugs confiscated from his automobile and video footage documenting his escape from custody.  The fact that Belcher was acquitted by the jury of two of the Counts against him further indicates that the contested statements did not render a fair trial impossible.

## CONCLUSION

Based on the foregoing, we conclude that the State did not commit prosecutorial misconduct that caused fundamental error depriving Belcher of a fair trial.

11

Affirmed.

ROBB, C. J. and KIRSCH, J. concur