

**FILED**

Feb 09 2015, 9:27 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Shane L. Keller,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 9, 2015

Court of Appeals Case No.
88A04-1404-CR-168

Appeal from the
Washington Superior Court

The Honorable Frank Newkirk, Jr.,
Judge

Cause No. 88D01-1307-FB-489

**Kirsch, Judge.**

Shane L. Keller was convicted following a jury trial of two counts of Class B felony burglary,[1] one count of Class C felony burglary,[2] three counts of Class D felony theft,[3] and two counts of Class D felony receiving stolen property.[4] The trial court sentenced Keller to maximum sentences on each of the eight convictions to run concurrently with one another, for an aggregate of twenty years executed. After Keller admitted to being a habitual offender, the trial court imposed a thirty-year enhancement to Count I, a Class B felony burglary conviction, for a total executed sentence of fifty years. Keller appeals his convictions and his sentence raising the following reordered and restated issues:

> I. Whether the trial court abused its discretion when it admitted and excluded certain evidence;

> II. Whether the trial court abused its discretion in instructing the jury regarding the definition of "dwelling" for the purpose of convicting Keller of Class B felony burglary; and

> III. Whether Keller's convictions and sentences for theft and receiving stolen property violate the prohibition against double jeopardy.[5]

---

[1] *See* Ind. Code § 35-43-2-1(1).

[2] *See* Ind. Code § 35-43-2-1.

[3] *See* Ind. Code § 35-43-4-2(a).

[4] *See* Ind. Code § 35-43-4-2(b). We note that, effective July 1, 2014, the statutes pertaining to burglary, theft, and receiving stolen property were amended. Keller committed his crimes prior to July 1, 2014; therefore, we use the statutes in effect at the time he committed the offenses.

[5] Keller also contends that his fifty-year sentence is inappropriate in light of the nature of the offense and the character of the offender. Because we remand to the trial court for resentencing, we do not address this issue.

[2] We affirm in part, reverse in part, and remand for resentencing.

## Facts and Procedural History

[3] Jeremy Hardwick's great-grandparents lived in a farmhouse on property located in Washington County, Indiana; a barn, a garage, and an outbuilding were also located on the land. After Hardwick's great-grandparents died in the late 1990s, the farmhouse remained vacant. In October 2012, Hardwick, his wife, and two children moved into Hardwick's sister-in-law's home, with the plan to remodel and then move into the farmhouse. No one slept at the farmhouse during the remodeling project; however, some food and most of the family's belongings were stored in the farmhouse. Hardwick also received his mail at the farmhouse.

[4] Hardwick described the farmhouse as being in "pretty rough" condition because it "[h]ad been sitting vacant for probably ten or twelve years." *Tr.* at 503. Photographs taken of the farmhouse around May 2013 revealed that most of the rooms were filled with boxes, bags, equipment, and assorted debris. *Def.'s Ex.* A. Hardwick began the remodeling project in the spring of 2013 and planned to do it alone. The project required Hardwick to do major renovations, and Hardwick worked on those renovations about four or five hours each night. At that time, he was also working at a factory job about six days a week, eight hours a day, and each day, he stopped at the farmhouse property to feed livestock.

On May 9, 2013, Hardwick stopped at the property after his factory shift. As he entered the barn, which had been closed but not locked, Hardwick noticed that several items had been moved from their normal place. When he inspected other buildings, he saw that the locked garage door had been pried open. Hardwick called the Washington County Sheriff's Department ("Sheriff's Department"), and Deputy Joseph Keltner responded. Further investigation revealed that Hardwick's .22 caliber, semiautomatic rifle and shells had been stolen from his truck, which had been parked in the barn. Also missing from the barn were a socket set and some combination wrenches. A Stihl chainsaw and a Stihl weed eater were missing from the garage.

That same evening, realizing that other items of value were still on the property, Hardwick and his wife bought four infrared "game cameras" and installed them in the farmhouse and other main buildings on the farm. *Tr.* at 513. Each camera was motion activated and took black and white images, which were stored on a removable SD memory card ("SD card"). *Id.* at 652. Thereafter, Hardwick checked the game cameras daily.

On June 2, 2013, Hardwick and his wife arrived at the property and noticed that the glass to the back door of the farmhouse was shattered. Several items were missing from the farmhouse, including an air compressor, a Craftsman nail gun, three cans of Zinsser Bulls Eye 1-2-3 primer, a circular saw, twenty boxes of cherry laminate flooring, a spool of electrical wiring, a kitchen faucet, drywall tools, and various items of food.

[8] Hardwick called the Sheriff's Department, and when Deputy Keltner responded, they discovered that the farmhouse game camera had taken several images ("June 2 photographs"). Contained within the June 2 photographs were images of the male burglar's profile ("State's Exhibit 17") and the distinctive logo on the t-shirt he wore ("State's Exhibit 16"). Removing the SD card from the camera, Deputy Keltner and Hardwick viewed the June 2 photographs on Deputy Keltner's laptop; neither immediately recognized the man pictured. After Deputy Keltner downloaded the June 2 photographs to his laptop, he returned the SD card to Hardwick, who stored it in a drawer. That evening, Hardwick installed a new SD card into the farmhouse game camera.

[9] Two days later, on June 4, 2013, Hardwick arrived at the farm and noticed another door to the farmhouse was broken. Hardwick again called the Sheriff's Department, and this time Sergeant Wayne Blevins responded. Inside the farmhouse, Sergeant Blevins found footprints that were imprinted with the Nike logo. Hardwick found that a stainless-steel sink and ammunition, among other things, were missing from the farmhouse. Sergeant Blevins viewed the pictures on the SD card ("June 4 photographs") and, like Deputy Keltner, downloaded them to his laptop and returned the SD card to Hardwick.

[10] As part of the investigation, Deputy Keltner showed a photograph of the burglar's profile—introduced at trial as State's Exhibit 17—to several Sheriff's Department deputies, individually, to see if they could identify the suspect. Sergeant Blevins and Deputy James Strange, each of whom had known Keller for twenty years, identified the suspect as Keller. *Tr.* at 651, 653, 657-59.

Detective Brent Miller, who had known Keller for twenty-four years, was shown the photograph of the burglar's profile as well as two enlarged and enhanced copies of that same photo. *See State's Exs.* 17, 31, 34. Detective Miller also identified the suspect as Keller. *Tr.* at 740-41, 790-92.

[11] Deputy Keltner obtained a warrant to search Keller's residence. On July 11, 2013, deputies executed that warrant and seized from Keller's closet a t-shirt marked with the distinctive logo pictured in the June 2 photographs. Keller, who was home during the search, admitted that the t-shirt belonged to him. The officers also seized a can of the same primer that had been taken from the farmhouse and saw no sign that Keller was priming any walls. The officers did not find any other stolen items or Nike shoes. On July 12, 2013, the State charged Keller in connection with the June 2 burglary with one count of Class B felony burglary, one count of Class D felony theft, and one count of Class D felony receiving stolen property. The State also alleged that Keller was a habitual offender.

[12] Prior to trial, Keller made several phone calls from jail, which were recorded. The State admitted and published each recording without objection.[6] On August 23, 2013, Keller called his father ("Father") and instructed:

> You go over to my house and you go, you tell Michelle you want papers out of the car and make sure there is no fucking hat, gloves, no

---

[6] While admitted at trial, these recordings are not contained in the record before us. Therefore, we rely on the transcription of these conversations.

fucking paperwork in the glove box. Take all of that fucking shit with
you. I need all that out of the car.

*Tr.* at 725 (*State's Ex.* 39). In the June 2 photographs, the burglar is wearing a
hat and gloves. *Id.* at 722-23.

[13] On September 6, 2013, while still in jail, Keller called James Cole, a neighbor
who lived across the street from Keller, saying:

> Listen and listen good. Go to my house, go upstairs. Face your house
> and look. That's all I'm saying, don't say no more. Don't repeat what
> I just said . . . . That's all you got to do. I mean, about four or five up
> and face your house and look around. . . . And everything, like I said,
> I just kind of wanted to see if you'd take care of that one problem for
> me. As far as I know, all they got is two pictures on me and it's from a
> trail camera. All I need for you . . . to do is that one thing and see
> what's over there that you think you can sell. If there's something you
> can sell let me know, write me a letter and tell me what you can get
> out of it, get me some money to get me through til the verdict. . . .
> But there's five hundred things over there and I think you might be
> able to do something with them, if you're not just destroy them . . . .
> You'll be surprised, you'll be like god damn. But you, I don't think
> they got anymore, they ain't got no more charges or nothing against
> me. Just that burglary over there.

*Tr.* at 717-18 (*State's Ex.* 37).

[14] On October 9, 2013, Keller called Father and expressed frustration regarding
Cole. In that recording, Keller told Father, "Jamie was supposed to have
brought me money up here last month and I ain't seen none of it, like usual."
*Id.* at 721 (*State's Ex.* 38). Father responded, "[W]ell, he got aggravated what
you said about him and he said . . . well he just dropped it. He said he should

have had them, that washing machine and dryer sold but he, you and him got into it over the phone and he just dropped it." *Id*. at 722. Keller responded, "The reason, part of it, that I'm in here. Almost everything that was stolen on that list is sitting on his front fucking porch." *Id*.

[15] Keller made additional phone calls to Father admitting his responsibility. On September 24, 2013, Keller told Father, "I got myself into this fucking mess." *Id*. at 736. On November 1, 2013, Keller again told Father, "But like I said I got myself into this mess. I'm going to have to get myself out of it you know." *Id*. at 738. Finally, on November 3, 2013, Keller called Father to complain, "[T]hey're wanting to give me more time than what Sterlin and time [sic] got for that shit they done, compared to this burglary case." *Id*. at 739-40. Father responded, "Devon is looking pretty rough then too," and Keller replied, "I know, he's got his, he ain't got no pictures or nothing on his." *Id*. at 740.

[16] Presumably based on these conversations, deputies searched Cole's home on November 14, 2013, and recovered from his porch several of Hardwick's stolen items, including the Stihl chainsaw, the Craftsman nail gun, and the stainless-steel sink, which had been stolen May 9, June 2, and June 4, 2013, respectively. *Id*. at 703-05. On November 25, 2013, the State also charged Keller for the May 9 and June 4, 2013 burglaries, with one count of Class B felony burglary, two counts of Class C felony burglary, three counts of Class D felony theft, and one count of Class D felony receiving stolen property.

[17] Keller's trial commenced on February 18, 2014. Over Keller's objection, the State admitted into evidence the June 2 photographs and the June 4 photographs as State's Exhibits 16 through18 and Exhibits 21 through 23, respectively. Again, over Keller's objection, the State also admitted copies of those same photographs, which had been enlarged and enhanced by Indiana State Police Trooper Robert Neal, as State's Exhibits 27 through 34. Also, over Keller's objection, Sergeant Blevins, Deputy Strange, and Detective Miller testified at trial that they had previously identified Keller as being the person pictured in State's Exhibit 17—the June 2 photograph depicting the burglar's profile. *Id.* at 651, 658-59, 741. Detective Miller testified that the person pictured in the June 2 and June 4 photographs could not be Cole, who was shorter and heavier than the man pictured. *Id.* at 792-93.

[18] The following was not admitted at trial. Keller asked out of the jury's presence to be allowed to try on the t-shirt bearing the distinctive logo to show the jury how it fit. He also asked that he be able to show the jury his shoes. The trial court granted Keller's request on the condition that if Keller did so, the State could cross-examine him, thereby opening the door to impeaching Keller's credibility. *Id.* at 769. Keller chose not try on the t-shirt or show his shoes to the jury. Additionally, Keller's request to introduce Sheriff's Department booking photographs, to show the jury that other arrested individuals also matched Keller's general description and body type, was also denied unless or until one or more of the photographs became relevant.

[19]     Both parties proposed a jury instruction defining "dwelling" as it pertained to the burglary charge. The trial court gave the following as Final Instruction Number 17, over Keller's objection that the last sentence of the instruction was overbroad:

> For purposes of the burglary statute, a dwelling is defined as a building, structure, or other enclosed space, permanent or temporary, moveable or fixed, that is a person's home or place of lodging. Any such place where a person keeps personal items with the intent to reside *in the near future* is considered a dwelling.

*Appellant's App.* at 596 (emphasis added).

[20]     The jury found Keller guilty of two counts of Class B felony burglary (Counts I and IV), one count of Class C felony burglary (Count VI), three counts of Class D felony theft (Counts II, V, and VII), and two counts of Class D felony receiving stolen property (Counts III and X). *Id*. at 891-92. Keller was found not guilty of Counts VIII and IX, one count of Class C felony burglary and one count of Class D felony theft, respectively. Following his convictions, Keller admitted to being a habitual offender. On March 19, 2014, the trial court ordered Keller to serve the maximum sentence for each of his convictions in the Department of Correction, *i.e.*, twenty years for each of Counts I and IV, eight years for Count VI, three years for each of Counts II, V, and VII, and three years for each of Counts III and X. These sentences were to be served concurrently with each other, with the habitual offender enhancement of thirty years added to Count I, for an aggregate sentence of fifty years executed. Keller now appeals his convictions and his sentence.

# Discussion and Decision

## I. Admission and Exclusion of Evidence

[21]   Keller contends that the trial court abused its discretion by admitting certain evidence and excluding other evidence. He contends that these evidentiary errors impacted his defense at trial that he was not the burglar pictured in the game camera photographs. The admission or exclusion of evidence is entrusted to the discretion of the trial court; we therefore review the trial court's decision for an abuse of discretion. *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Id*. In conducting our review, we consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Id*.

### A. Admission of Evidence

[22]   Keller asserts that the trial court abused its discretion when it: (1) allowed testimony of the three deputies who identified Keller as the person pictured in State's Exhibit 17; and (2) admitted State's Exhibits 27 through 34, the copies of the June 2 photographs and the June 4 photographs that were enhanced and enlarged by Trooper Neal. We address each of these claims in turn.

[23]   Prior to trial, Keller filed a motion in limine, asking the court to exclude Deputy Strange's and Sergeant Blevin's lay witness testimony that Keller was

the person pictured in State's Exhibit 17.[7] *Appellant's App.* at 399.  At that time, Keller asserted that, because of the quality of the photograph, the only thing that could be determined was that the suspect was probably a man and probably Caucasian.  *Tr.* at 241.  Keller argued that the probative value of that testimony was substantially outweighed by its unfair prejudice.[8]  *Appellant's App.* at 399. The trial court denied Keller's motion, and the deputies testified at trial over Keller's objection.

[24]     Both parties recognize that the trial court's ruling was governed by Indiana Rule of Evidence 701, pertaining to opinion testimony by lay witnesses. *Appellant's Br.* at 18, *Appellee's Br.* at 24-25.  Rule 701 provides, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to [an opinion] that is:  (a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."  Citing to *Groves v. State*, 456 N.E.2d 720 (Ind. Ct. App. 1983) and *Gibson v. State*, 709 N.E.2d 11 (Ind. Ct. App. 1999), *trans. denied*, Keller contends, "There is a disagreement within the Court of Appeals as to whether an opinion of a police officer identifying a defendant in a surveillance video or photograph is helpful to the jury under Indiana Rule of Evidence 701." *Appellant's Br.* at 18.  He argues, "'[A] witness' opinion as to what [the

---

[7] Keller did not object to the identification testimony of Detective Miller.

[8] Keller's argument of prejudice was, in part, based on the quality of the photograph.  We note, however, that during trial, when the State shared with defense counsel the copy of the photograph that had been shown to the deputies, defense counsel admitted, "[T]he quality of my photo is not nearly that good."  *Tr.* at 243.

photograph] is saying not only does not address itself to evidentiary competence but invades the province of the jury.'" *Appellant's Br.* at 19 (quoting *Groves*, 456 N.E.2d at 723). The State maintains that Keller incorrectly invites us to elevate the dicta in *Groves* over the later-enacted Rules of Evidence and subsequent caselaw, including *Goodson v. State*, 747 N.E.2d 1181, 1184 (Ind. Ct. App. 2001), *trans. denied*. We agree with the State and find that *Goodson* controls.

[25] In *Goodson*, the defendant relied upon *Groves* and argued that the trial court had invaded the province of the jury when it allowed two officers to testify that Goodson was the person depicted in videotapes and photographs of a drug sale. 747 N.E.2d at 1184. The *Goodson* court disagreed, holding that "the lay opinion of a police officer familiar with the defendant was admissible under Indiana Evidence Rule 701 . . . ." *Id.* (footnote omitted). The testifying officers had known Goodson for two or three years; accordingly, this court found the trial court had not abused its discretion in allowing the officers to testify because "their lay opinion that the person shown in the videotape was Goodson was helpful to the jury in determining the identity of the person depicted therein." *Id.* Here, each of the deputies had known Keller for twenty years or more, and each gave his lay opinion that the person pictured in State's Exhibit 17 was Keller. Under the reasoning of *Goodson*, the trial court did not abuse its discretion when it allowed the deputies to testify at trial.

[26] Keller also argues that the trial court abused its discretion when it admitted, over his objection, State's Exhibits 27 through 34. At trial, the State offered the testimony of Trooper Neal, a detective with the "technical services office," who

testified that State's Exhibits 27 through 34 were copies of the previously admitted June 2 and June 4 photographs, State's Exhibits 16 through 18 and 21 through 23, respectively,[9] for which he had enlarged and adjusted the contrast using an Adobe Photoshop CS5 program. *Tr.* at 625, 667, 681. Trooper Neal explained that the Adobe program did not add or remove objects from the photographs, instead, the program "improve[d] the appearance of a still image." *Id.* at 682. Assuming without deciding that the trial court abused its discretion in admitting the enhanced exhibits, the error was harmless.[10] State's Exhibit 17 was admitted without being enlarged or enhanced; therefore, the enhanced photos were merely cumulative evidence because Deputy Strange and Sergeant Blevins testified that they identified the suspect as Keller by looking only at State's Exhibit 17. *Tr.* at 651, 653, 657-59. In fact, Sergeant Blevins testified he "was a hundred percent sure when [he] saw the photo that it was Shane Keller." *Id.* at 653. Error, if any, in the trial court's admission of the enhanced and enlarged photographs was, therefore, harmless.

---

[9] While Keller objected at trial to the admission of the June 2 and June 4 photographs, he makes no claim on appeal that the trial court abused its discretion in admitting those photographs. As such that claim is waived. Instead, he contends that the trial court abused its discretion by admitting into evidence the "altered photographs," State's Exhibits 27 through 34. *Appellant's Br.* at 22.

[10] We note, however, that in *Arlton v. Schraut*, 936 N.E.2d 831, 838 (Ind. Ct. App. 2010), *trans. denied*, this court held it was an abuse of discretion for the trial court to exclude enlargements made from previously admitted digital images where those enlargements were accurate representations of the evidence portrayed.

## B. Exclusion of Evidence

[27] Keller also contends that the trial court abused its discretion when it: (1) excluded the Sheriff's Department booking photographs of other arrested individuals, and (2) denied Keller's request to try on the t-shirt in front of the jury and show the jury his shoes. We address these claims in turn.

[28] During trial, Keller moved to admit numerous Sheriff's Department booking photographs as photographs to use in the cross-examination of Detective Miller, in order to show the jury that other arrested individuals also matched Keller's general description and body type. The State objected and filed a motion in limine to exclude the booking photographs. *Appellant's App.* at 526. Discussion was held outside the presence of the jury, and the trial court granted the State's motion to exclude the photos "unless [a] mug shot becomes relevant." *Tr.* at 769. The trial court made clear that simply asking Detective Miller "to identify mug shots from the jail would not make it relevant." *Id.* The booking photographs were not admitted.

[29] Keller asserts that the booking photographs would have impeached the deputies' opinions that it was Keller pictured in the game camera at the farmhouse. He argues that the photographs were not only relevant to the course of investigation, but also to Keller's defense of a biased misidentification. During trial, the State confirmed with Detective Miller that his identification of Keller was made after he looked at a photograph of the burglar's profile. Detective Miller testified that the booking photographs were "head on facial shots," not profile shots. *Tr.* at 783. He also testified that while it might be

"possible" to determine someone's profile using a head-on shot, it would be difficult, and he would prefer to have a profile shot. *Id.* Defense counsel, while conceding that the booking photographs were "not ideal," asked the court to admit them on the basis that they depicted "all kinds of people," and were relevant to the issue of identity. *Id.* at 784. The trial court denied the admission of the booking photos, finding that they were not relevant and would not be admitted based on the "questions that have been asked at this point." *Id.* Detective Miller was not asked any more questions about the booking photographs, and they were not admitted. *Id.* at 786.

[30] The trial court did not abuse its discretion. Here, Keller wanted the booking photographs admitted to "put into evidence other possibilities of people who have been in the system." *Id.* at 749. This evidence was intended to impeach the deputies' previous testimony that Keller was pictured in State's Exhibit 17. Keller intended to ask Detective Miller if he was familiar with the way the records were kept and whether the booking photographs were in compliance. *Tr.* at 757. The trial judge inquired, "Well, once he does that, assuming that he even can, and I don't know if he can. Then once he's done that then you've got the burden of establishing some relevance." *Id.* The trial judge asked defense counsel if he was going to cross-examine Detective Miller using certain photos to compare them against "the pictures taken at the house." *Id.* Defense counsel responded, "No." *Id.* Keller has failed to prove that the photographs were relevant. Furthermore, the exclusion of these photographs was harmless. Even without the booking photographs, Keller was able to convey to the jury his

defense that he was not the individual pictured in the game camera photographs. The jury was able to judge the quality of the June 2 and June 4 photographs and compare them against Keller's profile as he sat at trial. We cannot say that the trial court abused its discretion in excluding random Sheriff's Department booking photographs, the use of which was to suggest that Exhibit 17 might depict someone other than Keller.

[31] Keller also argues that the trial court should have allowed him to try on and show the jury the logo t-shirt and the shoes he was wearing when he was arrested. In part, he contends that by showing the jury that the t-shirt did not fit him in the same manner it fit the man pictured in the June 2 photographs and by showing that his shoes were not made by Nike, he could show that he was not the man pictured. Keller asserts that the trial court abused its discretion in excluding this evidence because its admission would have undermined the identification of Keller as the man in the farmhouse.

[32] We begin by noting that the trial court did not exclude this evidence; instead, it held that Keller would be subject to cross-examination following the demonstration. Keller chose not to admit the evidence and subject himself to cross-examination. In the absence of context, which cross-examination could have provided, Keller's evidence would have been misleading. Regarding the fit of the t-shirt, Keller admitted outside the presence of the jury that he had gained a lot of weight since his arrest. Additionally, it was irrelevant what shoes Keller was wearing at the time of his arrest, more than a month after the crimes were committed.

[33] Even if we consider the issue as an error in the exclusion of evidence, as Keller asserts, any error was harmless. The t-shirt demonstration and admission of shoes were intended to bolster Keller's contention that he was not the one pictured by the game camera. However, there was abundant evidence that Keller was the person pictured by the game camera. Deputy Strange, Sergeant Blevins, and Detective Miller, each of whom had known Keller for more than twenty years, testified that Keller was the person caught on the game camera in State's Exhibit 17. Furthermore, during telephone calls from prison, Keller repeatedly told Father, "I got myself into this mess." *Tr.* at 738, 40. Finally, Keller recognized that the State had pictures of him when, speaking to Father, he said, "[T]hey're wanting to give me more time than what Sterlin and time [sic] got for that shit they done, compared to this burglary case." *Id.* at 739-40. Father responded, "Devon is looking pretty rough then too," and Keller replied, "I know, he's got his, he ain't got no pictures or nothing on his." *Id.* at 740. The demonstration of trying on the t-shirt and showing the jury Keller's shoes could not have overcome the properly admitted evidence that Keller was the man pictured in State's Exhibit 17.

## II. Jury Instruction

[34] Keller next contends that the trial court abused its discretion when, for purposes of Class B felony burglary, it instructed the jury regarding the definition of the term dwelling. We afford trial courts broad discretion in the manner of instructing a jury, and we review such decisions only for an abuse of that discretion. *Hayden v. State*, 19 N.E.3d 831, 838 (Ind. Ct. App. 2014). "When

reviewing jury instructions on appeal, we look to (1) whether the tendered instructions correctly state the law, (2) whether there is evidence in the record to support giving the instruction, and (3) whether the substance of the proffered instruction is covered by other instructions." *Id*. We will reverse a conviction only where the appellant demonstrates that an error in the jury instructions prejudiced his substantial rights. *Id*. "[W]here a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise, we will not reverse the conviction." *Id*. (internal quotation marks omitted). "'The purpose of [a] jury instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict.'" *Id*. (quoting *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001)).

[35] The difference between Class B and Class C felony burglary is the type of building that is entered, *i.e.*, burglary is enhanced if it takes place in a "dwelling." Ind. Code § 35-43-2-1. Due to the importance of this distinction, both parties proposed a jury instructions on the definition of "dwelling." Keller proposed the following instruction, which tracked the statutory definition found in Indiana Code section 35-31.5-2-107: "'Dwelling' means a building, structure or other enclosed space, permanent or temporary, moveable or fixed, that is a person's home or place of lodging." *Appellant's App*. at 568. The State offered the following proposed instruction, which added the italicized language:

> For purposes of the burglary statute, a dwelling is defined as a building, structure, or other enclosed space, permanent or temporary, moveable or fixed, that is a person's home or place of lodging. *Any*

> *such place where a person keeps personal items with the intent to reside at some future time is considered a dwelling.*

*Id*. at 544. The State cited *White v. State*, 846 N.E.2d 1026, 1031 (Ind. Ct. App. 2006), *trans. denied*, as the source of the additional language. The trial court reviewed *White* and modified the instruction to one that neither party offered. Final Instruction Number 17 read:

> For purposes of the burglary statute, a dwelling is defined as a building, structure, or other enclosed space, permanent or temporary, moveable or fixed, that is a person's home or place of lodging. Any such place where a person keeps personal items with the intent to *reside in the near future* is considered a dwelling.

*Appellant's App.* at 596.

[36] In *White*, the victim, House, bought a residence in August 2003. One month later, House was in the process of remodeling. While House was not yet living at the home, he had moved furniture, clothes, beds, couches, refrigerator freezers, a television set, a radio, tools, and a washer and dryer into the house. *White*, 846 N.E.2d at 1031. House also kept his dog outside and visited several times a day. On September 15, 2003, White broke into House's home and stole a radio and a television. White was convicted of Class B felony burglary.

[37] On appeal, White argued that the evidence was insufficient to sustain his burglary conviction because the State failed to prove beyond a reasonable doubt that the building was a dwelling. In finding that there was sufficient evidence to sustain a conviction for Class B felony burglary, the *White* court reasoned:

In the instant case, the record clearly supports that House purchased the property for use as a permanent residence. At trial, House testified he was in the process of remodeling the house and spent time at the house several times a day. House had moved furniture, clothes, beds, couches, refrigerator freezers, a television set, a radio, tools, and a washer and dryer into the house. In a similar case, *Byers v. State*, 521 N.E.2d 318, 319 (Ind. 1988), the victims were in the process of moving out when their home was burglarized. The defendant argued because they did not intend to sleep at that location the night of the break-in nor did they intend to sleep there for the week remaining on their lease, it was not a dwelling. The *Byers* court noted, however, that because the victims intended to retain their right of dominion and return to the premises it should be considered a dwelling. Although, in the instant case the evidence established that House was in the process of moving into the house, the difference between moving out and moving in is too tenuous with regard to the facts at issue to make such a distinction. As a result, it would defy logic to classify House's house as anything other than a dwelling for the purposes of the . . . burglary statutes. While it is uncertain when House and his family were to take up permanent residency in the house, it is clear that they intended to do so *in the near future*. Therefore, we find that the state proved beyond a reasonable doubt that the house was a dwelling.

*White,* 846 N.E.2d at 1031 (emphasis added) (citations omitted).

[38] Under the unusual facts of this case, we need not address whether the trial court abused its discretion. Assuming without deciding that the jury was properly instructed that a dwelling includes any such place "where a person keeps personal items with the intent to *reside in the near future*," we find insufficient evidence to support the jury's determination that the farmhouse was a dwelling for purposes of a Class B felony burglary conviction.

[39] Hardwick's great-grandparents died in the late 1990s and, thereafter, the farmhouse remained vacant. In October 2012, Hardwick, his wife, and two

children moved into Hardwick's sister-in-law's home, with the plan to remodel and then move into the farmhouse. Some food was kept in the freezer of the farmhouse and most of the family's belongings were also stored in the farmhouse. Hardwick received his mail at the farmhouse and went by daily to feed livestock.

[40] Even so, Hardwick described the farmhouse as being in "pretty rough" condition because it "[h]ad been sitting vacant for probably ten or twelve years." *Tr.* at 503. Hardwick did not even start the remodeling project until the spring of 2013 and planned to do it alone. The project required Hardwick to tear out walls, install insulation, put up dry wall, paint, install new plumbing, redo part of the electrical system, redo the kitchen cabinetry, put in new light fixtures, and install a new tub, toilet, and vanity in the bathroom. Hardwick worked on the renovations about four or five hours a night. At that time he was also working at a factory job about six days a week. Photographs taken of the farmhouse around May 2013 revealed that most of the rooms were filled with boxes, bags, equipment, and assorted debris. *Def.'s Ex.* A.

[41] Indiana courts have held

> burglary, like arson, to be an offense against the habitation. This is reflected in the burglary statute itself, which provides for greater penalties the closer the offense comes to endangering another's life or well-being. In determining what constitutes a dwelling, *Watt v. State,* 446 N.E.2d 644, 645 (Ind. Ct. App. 1983), purports that the Indiana courts have given dwelling its plain and usual meaning. "The operative word defining 'dwelling' is a 'home'—a settled residence house for a family and their personal possessions."

*Hayden*, 19 N.E.3d at 837 (quoting *White,* 846 N.E.2d at 1031) (citations omitted). During the February 2014 trial—more than eight months after the June 4 burglary—Hardwick testified that he still lived with his relatives. Based on this evidence, we cannot say that the State proved that Hardwick intended to move into the farmhouse *in the near future*.

[42] To convict Keller of Class B felony burglary, the State had to prove that he broke and entered a building or structure that was a *dwelling*, with intent to commit a felony or theft therein. For Class C felony burglary, the State would have to prove that Keller broke and entered any building or structure, with the intent to commit a felony or theft therein. Ind. Code § 35-43-2-1. A crime is a lesser included offense of another if it is impossible to commit the greater offense without first having committed the lesser one. *Bedgood v. State*, 477 N.E.2d 869, 872 (Ind. 1985). Class C felony burglary is a lesser-included offense of Class B felony burglary. Keller's convictions for two counts of Class B felony burglary reveal that the jury believed that Keller was the person who broke into the farmhouse with the intent to steal Keller's property. Here, while finding that there was insufficient evidence to prove that Keller broke into a dwelling, there was more than sufficient evidence to convict Keller of the lesser-included offenses of Class C felony burglary on June 2, 2013 and again on June 4, 2013. We remand to the trial court with instructions to reduce Keller's convictions under Counts I and IV from Class B felony burglary to Class C felony burglary and resentence accordingly. Additionally, we instruct the trial

court to resentence Keller's enhancement for being a habitual offender to reflect that Count I is a conviction for Class C felony burglary.

## III.  Double Jeopardy

[43]  Finally, Keller argues that his convictions for theft and receiving stolen property violate the prohibitions against double jeopardy.  It is well established that two or more offenses are the "same offense" in violation of Article I, section 14 of the Indiana Constitution if, "with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense."  *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999) (emphasis in original).

[44]  Here, we look to the statutory elements.  At the time Keller committed the crime, Class D felony theft was defined as:

> A person who knowingly or intentionally exerts unauthorized control over the property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D Felony.

[45]  Ind. Code § 35-43-4-2(a).  The crime of Class D felony receiving stolen property was, in pertinent part, defined as:

> A person who knowingly or intentionally receives, retains or disposes of the property of another person that has been the subject of theft commits receiving stolen property, a Class D Felony.

I.C. § 35-43-4-2(b). To prove that a person committed the crime of receiving stolen property, therefore, the State is also required to prove that the stolen object received was the subject of a theft. "Where, as here, the person who committed the theft was also convicted of receiving that same stolen property, then the elements of theft are inherently included in receiving stolen property." *White v. State*, 944 N.E.2d 532, 536 (Ind. Ct. App. 2011), *trans. granted, summarily affirmed on this issue*, 963 N.E.2d 511, 520 (Ind. 2012). "In other words, an individual cannot be convicted of stealing property and of receiving that property when the spoils of victory are divvied up." *Id*.

Keller notes that the information for Count III, receiving stolen property, alleged that he received, retained, or disposed of Hardwick's Zinsser primer, which was one of the items Keller was alleged to have taken in Count II, theft. The information for Count X, receiving stolen property, alleged that he received, retained, or disposed of a Stihl chainsaw, a Craftsman nail gun, and a stainless-steel sink. Keller was charged with the theft of these same items as follows: the Craftsman nail gun in Count II; the stainless-steel sink in Count V; and the Stihl chainsaw in Count VII. Keller's convictions for both theft and receiving stolen property, therefore, violate the prohibition against double jeopardy. We remand with instructions that the trial court vacate Counts III

and X, the receiving-stolen-property convictions and the sentences imposed thereon.[11]

[46] We affirm in part, reverse in part, and remand for resentencing.

Friedlander, J., and Crone, J., concur.

---

[11] As we noted above, Keller also contends that his fifty-year sentence is inappropriate in light of the nature of the offense and the character of the offender. Because we remand to the trial court, in part, for resentencing, we do not address this issue. However, because this issue could be raised on a subsequent appeal, we remind Keller that an extensive criminal history is a significant factor in our evaluation of the character of the offender when reviewing whether a sentence is inappropriate under Indiana Appellate Rule 7(B).