## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jun 02 2015, 9:10 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Jeremy K. Nix
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ricci Dale Davis, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 2, 2015

Court of Appeals Case No. 35A02-1411-CR-804

Appeal from the Huntington Superior Court.

The Honorable Jeffrey R. Heffelfinger, Judge.

Cause No. 35D01-1405-FA-128

**Riley, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Ricci Dale Davis, Jr. (Davis), appeals his conviction for dealing in methamphetamine within 1,000 feet of a youth program center, a Class A felony, Ind. Code § 35-48-4-1.1(a)(1)(A),(b)(3)(B)(iv) (2013).

We affirm.

## ISSUES

Davis raises three issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by failing to instruct the jury on lesser-included offenses of dealing in methamphetamine;

(2) Whether the trial court abused its discretion by excluding evidence regarding the accuracy of the State's measurement of distance between Davis' house and two youth program centers; and

(3) Whether Davis' sentence is inappropriate in light of the nature of the offense and his character.

## FACTS AND PROCEDURAL HISTORY

Shortly before 11:00 p.m. on May 19, 2014, a man called the Huntington County Sheriff's Department on its non-emergency line and reported that he had a warrant and "was strung out on meth and to come get him and take it all out of his house." (Tr. p. 99). In response to the call, the Sheriff's Department dispatched the Huntington Police Department to 533 East Franklin Street,

Huntington, Indiana, upon verification that the occupant thereof, Davis, had an active warrant.

[5] When the police officers arrived at the residence and were positioning themselves around the property, Greggory Fisher (Fisher) emerged from the house. Detective Captain (now Chief) Chad Hacker (Chief Hacker) intercepted him, and Fisher confirmed that Davis was present and indicated that methamphetamine was being manufactured inside the house. The possibility of an active methamphetamine lab necessitated special protocol for searching and evacuating the residence. The officers knocked on the front door, and Joshua Dyer (Dyer) and Davis' wife, Melinda Beougher (Beougher), came outside to speak with the officers. They advised that two young children were asleep in the living room, so the officers permitted Dyer to return to the house to retrieve them. During this time, Davis' roommate, Rachelle Lesh (Lesh), and Vic Bowling attempted to exit the house through the back door and were corralled by the police for questioning. Once the first floor had been cleared, the officers allowed Beougher, at her request, to go back inside to summon Davis from the second floor.

[6] Fifteen minutes after the police had first knocked on the door, Davis came downstairs, along with Thomas Hale (Hale) and Amanda (Casto). The officers escorted him outside, placed him in handcuffs, and administered his *Miranda* warnings. Davis indicated that he and Hale had been manufacturing methamphetamine on the second floor of the house. Davis further stated that when they heard the officers knocking on the door, Hale began hiding the

supplies. Thus, Davis offered to accompany the officers inside to show them where everything was. For safety reasons, the officers would not allow Davis back into the house, but upon questioning as to whether there was an active lab that could pose any danger to the officers, Davis assured them that everything was safe.

[7] As the officers climbed the staircase, they detected the "very distinct," "overwhelming chemical" odor associated with manufacturing methamphetamine. (Tr. pp. 247, 262). The odor was most potent in the upstairs bathroom, emanating from the toilet and the sink in particular. Once they confirmed that there was nobody else in the house, the officers went back outside to retrieve their protective gear. After obtaining consent to search the home from the landlord, several officers trained in dismantling methamphetamine labs entered the house to process the scene.

[8] No active methamphetamine lab was discovered, nor did the police officers recover any finished methamphetamine product. However, spread throughout nearly every room of the house, the officers found evidence of all of the ingredients and other equipment necessary to manufacture methamphetamine, including: numerous empty boxes and blister packs that had contained pseudoephedrine pills; empty boxes and the water bladders from cold compresses and the ammonium nitrate that had been extracted therefrom; lithium batteries and empty battery packages; salt; several bottles of drain cleaner (lye); Liquid Fire (sulfuric acid); three empty one-gallon containers of Coleman fuel (an organic solvent); coffee filters; plastic tubing; funnels; Ziploc

bags; side cutters (for stripping the lithium out of the batteries); gas masks; and latex gloves. The search also revealed a plastic bag containing a liquid substance; a bottle that had been used as a "one-pot" (first stage of methamphetamine manufacturing); at least six bottles that had been used as hydrochloric gas (HCL) generators (second stage of methamphetamine manufacturing), one of which was located on the upstairs toilet lid; a cast iron skillet coated in white powder; a pill crusher; several loose syringes; and "partial directions on a couple steps of manufacturing methamphetamine." (Tr. pp. 206, 211). Testing on the liquid substance indicated the presence of methamphetamine, but the sample was too diluted to run a confirmatory test.

[9] On May 20, 2014, the State filed an Information, charging Davis with a Class A felony for dealing methamphetamine within 1,000 feet of a youth program center. I.C. § 35-48-4-1.1(b)(3)(B)(iv) (2013).[1] On October 1 through October 3, 2014, the trial court conducted a jury trial. At the close of the evidence, the jury returned a guilty verdict. On October 28, 2014, the trial court held a sentencing hearing. After entering a judgment of conviction on the Class A felony, the trial court imposed a fifty-year sentence, fully executed in the Indiana Department of Correction (DOC).

[10] Davis now appeals. Additional facts will be provided as necessary.

---

[1] The evidence established that Davis' house was 970 feet from the Trinity United Methodist Church, which housed a preschool and other youth programs, and 940 feet from the Boys & Girls Club of Huntington County.

I. *Jury Instruction*

Davis first claims that the trial court erred by refusing to tender his proposed instruction on lesser-included offenses to the jury. "The manner of instructing a jury is left to the sound discretion of the trial court." *Albores v. State*, 987 N.E.2d 98, 99 (Ind. Ct. App. 2013), *trans. denied*. A trial court's decision to give or refusal to give a jury instruction is subject to review only for an abuse of discretion. *Id.*

In this case, Davis tendered a proposed instruction which informed the jury that if it found him "not guilty of the charged offense then you may consider whether the Accused is guilty of the included offenses." (Appellant's App. p. 44). Specifically, the instruction identified possession of precursors with intent to manufacture a controlled substance, maintaining a common nuisance, and possession of methamphetamine as lesser-included offenses of dealing in methamphetamine. Our supreme court has developed a three-part analysis that the trial court must engage in when determining whether to include a jury instruction on a lesser-included offense. *See Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995).

First, the trial court must

> compare the statute defining the crime charged with the statute
> defining the alleged lesser included offense. If
>     (a) the alleged lesser included offense may be established by "proof
> of the same material elements or less than all the material elements"
> defining the crime charged, or

(b) the only feature distinguishing the alleged lesser included offense from the crime charged is that a lesser culpability is required to establish the commission of the lesser offense,

then the alleged lesser included offense is *inherently* included in the crime charged.

*Id.* (internal citations and footnote omitted). If an offense is inherently included in the charged offense, the trial court should proceed directly to the third step of the analysis. *Id.* at 566-57.

[14] Second, if the first prong indicates that the alleged lesser-included offense is not inherently included in the charged offense, then the trial court

must compare the statute defining the alleged lesser included offense with the charging instrument in the case. If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense, then the alleged lesser included offense is *factually* included in the crime charged, and the trial court should proceed to step three below.

*Id.* at 567 (internal citations omitted). If the alleged lesser offense is neither *inherently* nor *factually* included in the charged crime, the trial court need not give the requested lesser-included offense instruction. *Id.*

[15] The third and final step of the analysis provides that

if a trial court has determined that an alleged lesser included offense is *either* inherently *or* factually included in the crime charged, it must look at the evidence presented in the case by both parties. If there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense. If the evidence does not so support the giving of a

requested instruction on an inherently or factually included lesser offense, then a trial court should not give the requested instruction.

*Id.* (internal citation and footnote omitted).

[16] On appeal, Davis concedes that possession of methamphetamine is neither inherently nor factually included in the crime of dealing in methamphetamine. Accordingly, we will address the other alleged lesser-included offenses in turn.

### A. *Possession of Precursors with Intent to Manufacture*

[17] Davis' tendered final instruction stated, in part, that

> [t]he crime of Possession of Chemical Reagents or Precursors with Intent to Manufacture Controlled Substances is included in the charged crime of Dealing in Methamphetamine. . . . If the State did prove each of the elements of the crime of Possession of Chemical Reagents or Precursors with Intent to Manufacture Controlled Substances beyond a reasonable doubt, you may find the accused guilty of Possession of Chemical Reagents or Precursors with Intent to Manufacture Controlled Substances, a Class D felony.

(Appellant's App. pp. 44-45). Davis now contends that possession of precursors "was necessarily an included offense of the actual manufacture of methamphetamine." (Appellant's Br. p. 11).

[18] According to the test set forth in *Wright*, we must first compare the two statutes to determine whether possession of precursors is an inherently lesser-included offense of dealing in methamphetamine. A person who knowingly or intentionally manufactures methamphetamine, pure or adulterated, within 1,000 feet of a youth program center commits dealing in methamphetamine as a Class A felony. I.C. § 35-48-4-1.1(a)(1)(A),(b)(3)(B)(iv) (2013). On the other hand, "[a] person who possesses two (2) or more chemical reagents or

precursors with the intent to manufacture a controlled substance commits a Class D felony." I.C. § 35-48-4-14.5(e) (2013). This offense is elevated to a Class C felony if the person who possessed these precursors with an intent to manufacture did so within 1,000 feet of a youth program center. I.C. § 35-48-4-14.5(f)(2)(D) (2013). This court has previously determined "that possession of precursors with intent to manufacture meth is a lesser-included offense of manufacturing meth." *Fancil v. State*, 966 N.E.2d 700, 709 (Ind. Ct. App. 2012), *trans. denied*. The only issue left to determine is whether there was a serious evidentiary dispute in the distinguishing element from which the jury could conclude that the lesser offense was committed but not the greater. *See id.*

[19] It is well settled that "one may be guilty of possessing chemical precursors with intent to manufacture without actually beginning the manufacturing process, whereas the manufacturing process must, at the very least, have been started by a defendant in order to be found guilty of manufacturing methamphetamine." *Id.* In this case, the undisputed evidence establishes that there was "an overwhelming chemical smell" emanating from the second floor of the house, which is associated with cooking methamphetamine. (Tr. p. 262). Davis and Hale had approximately fifteen minutes to hide and discard evidence while the police officers cleared the rest of the house, and an HCL generator was found in the upstairs bathroom where the odor was the strongest. In his initial conversation with Chief Hacker, Davis stated, "This was going to be the last time I was going to do this, Hacker." (Tr. p. 138). Later that night, during his recorded police interview, Davis explained that people would bring

pseudoephedrine and other ingredients to the house in exchange for methamphetamine. Although Davis changed his story several times during his conversations with the police, the jury heard him admit that he had, at the very least, assisted both Hale and his former roommate—Donald Parker (Parker)—to manufacture methamphetamine at 533 East Franklin Street between January 1 and May 20, 2014.

[20] Furthermore, the evidence revealed that Davis and Parker cooked methamphetamine together in order to pay the rent and other bills. Parker's wife, Lesh, explained that she frequently purchased pseudoephedrine and other supplies because Davis and Parker were cooking methamphetamine "[a]lmost daily." (Tr. p. 341). In fact, Lesh specified that Davis had been manufacturing methamphetamine from 10:00 a.m. to 4:00 p.m. on the date of the officers' search. Additionally, Fisher testified that after Parker was arrested in April of 2014, Davis continued to cook methamphetamine. Fisher observed Davis shaking the bottle and could smell the fumes of the cooking process. Casto testified that she would give Davis pseudoephedrine pills in exchange for methamphetamine and that she had witnessed him measuring ingredients, crushing pills, and stripping the lithium out of batteries. In light of all this evidence, we find that there was no *serious* evidentiary dispute as to whether Davis actually manufactured methamphetamine during the relevant time period. Because a jury could not reasonably have concluded that Davis simply possessed the precursors but had not begun the manufacturing process, we

conclude that the trial court properly exercised its discretion in declining to give Davis' proffered jury instruction.

### B. *Maintaining a Common Nuisance*

[21] Davis' proposed jury instruction also stated:

> The crime of Maintaining a Common Nuisance is also included in the charged crime of Dealing in Methamphetamine. . . . If the State did prove each of the elements of the crime of Maintaining a Common Nuisance beyond a reasonable doubt, you may find the accused guilty of Maintaining a Common Nuisance, a Class D felony.

(Appellant's App. pp. 45-46). To support a conviction of maintaining a common nuisance, the State must establish that a person

> knowingly or intentionally maintains a building, structure, vehicle, or other place that is used one (1) or more times:
> (1) by persons to unlawfully use controlled substances; or
> (2) for unlawfully:
>     (A) manufacturing;
>     (B) keeping;
>     (C) offering for sale;
>     (D) selling;
>     (E) delivering; or
>     (F) financing the delivery of;
> controlled substances, or items of drug paraphernalia.

I.C. § 35-48-4-13(b) (2013). Davis concedes that maintaining a common nuisance is not an inherently lesser-included offense because maintaining a building, structure, vehicle or other place is not an element of dealing in methamphetamine. Instead, he argues that maintaining a common nuisance is factually included in the crime of dealing methamphetamine.

[22] Under the *Wright* test, we must determine whether the charging instrument alleges that the means used to commit dealing in methamphetamine include all of the elements of maintaining a common nuisance. In the Information, the State charged that between January 1 and May 20, 2014, Davis "knowingly manufactured methamphetamine, pure or adulterated, and [Davis] manufactured methamphetamine within one thousand (1,000) feet of a youth program center." (Appellant's App. p. 12). The Information does not charge that Davis maintained a building, structure, vehicle, or other place to facilitate the manufacture of methamphetamine. *See Sledge v. State*, 677 N.E.2d 82, 86 (Ind. Ct. App. 1997) (determining that maintaining a common nuisance was not a factually lesser-included offense of dealing in cocaine). Thus, the State was not required to prove that Davis maintained the house at 533 East Franklin Street. Rather, it was sufficient for the State's burden of proof to simply establish that Davis manufactured methamphetamine within 1,000 feet of a youth program center. We find that—under the facts of this particular case— maintaining a common nuisance is not factually included in the crime of dealing in methamphetamine; thus, the trial court properly declined to give this instruction.

## II. *Exclusion of Evidence*

[23] Davis next claims that the trial court abused its discretion by excluding evidence that purported to challenge the accuracy of the State's measurements between his house and two youth program centers. It is well established that a trial court has broad discretion in the admission or exclusion of evidence, and

its rulings are subject to review only for an abuse of that discretion. *Charley v. State*, 651 N.E.2d 300, 302 (Ind. Ct. App. 1995). It is an abuse of discretion if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or if the trial court misinterprets the law. *Keller v. State*, 25 N.E.3d 807, 813 (Ind. Ct. App. 2015). Any error in the trial court's exclusion of evidence will be disregarded as harmless error unless it affects the substantial rights of a party. *Barnhart v. State*, 15 N.E.3d 138, 143 (Ind. Ct. App. 2014).

[24] The State charged Davis with a Class A felony by alleging that he manufactured methamphetamine within 1,000 feet of a youth program center. *See* I.C. § 35-48-4-1.1(a)(1)(A),(b)(3)(B)(iv) (2013). At trial, the State introduced evidence demonstrating that Davis' house was located 970 feet from Trinity United Methodist Church and 940 feet from the Boys & Girls Club of Huntington County. These measurements were determined by Huntington County's Geographic Information System (GIS) technician, Dathen Strine (Technician Strine).

[25] Technician Strine testified that his job is to maintain GIS data for Huntington County and to provide updated information for inclusion on the Beacon website. The Beacon website, which is maintained by a third party, is accessible to the public and contains "aerial information, parcel information," and various other information gathered from county sources. (Tr. p. 475). Using aerial photography embedded with GPS data, Technician Strine is required to create maps that depict 1,000-foot buffers around certain structures

as prescribed by statute—such as schools. Thus, any individual may access the Beacon website and view these maps to determine, for example, whether his house is located within the 1,000-foot range of a school, park, or youth program center. Upon request, Technician Strine is also able to pinpoint two specific locations and calculate the distance within a five-foot margin of error using ArcMap software.

[26] Although Technician Strine used special software to calculate the requested distances from Davis' house to the two youth program centers, he relied upon the same information that is contained on the Beacon website. As such, Davis sought to introduce the Terms and Conditions of the Beacon website as evidence that Technician Strine's calculation could be based on inaccurate data points. The Terms and Conditions, which a public user must accept prior to accessing the Beacon website, states:

### IMPORTANT DISCLAIMER

By using this site, I agree that I understand and am bound by the following conditions.

**General.** The information on this Web Site was prepared from a Geographic Information System established by Huntington County for their internal purposes only, and was not designed or intended for general use by members of the public. Huntington County, its employees, agents and personnel, makes no representation or warranty as to its accuracy, and in particular, its accuracy as to labeling, dimensions, contours, property boundaries, or placement or location of any map features thereon; nor to the accuracy of any other information contained thereon.

**Disclaimer.** Huntington County Digital Data is the property of Huntington County, Indiana © **2000 Huntington County, IN**. All

graphic data supplied by Huntington County has been derived from public records that are constantly undergoing change and is not warranted for content or accuracy. The county does not guarantee the positional or thematic accuracy of the data. The cartographic digital file server is not a legal representation of any of the features depicted, and Huntington County disclaims any assumption of the legal status they represent. Any implied warranties, including warranties of merchantability or fitness for a particular purpose, shall be expressly excluded. The data represents an actual reproduction of data contained in Huntington County's computer files. This data may be incomplete or inaccurate, and is subject to modifications and changes. Therefore, Huntington County cannot be held liable for errors or omissions in the data. The recipient's use and reliance upon such data is at the recipient's risk. By using this data, the recipient agrees to protect, hold harmless and indemnify Huntington County and its employees and officers. This indemnity covers reasonable attorney fees and all court costs associated with the defense of Huntington County arising out of this disclaimer. The recipient may copy this data into computer memory or onto computer storage devices and prepare derivative works from it.

(Defendant's Exh. A). The State objected to the admission of the Terms and Conditions on grounds that it would be confusing to the jury because the accuracy of Technician Strine's measurements—not the accuracy of a member of the public using the Beacon website to create a measurement—is the relevant inquiry. Following an offer of proof, the trial court excluded the exhibit from evidence because "[i]t is a disclaimer of liability . . . . It's not a declaration as far as accuracy." (Tr. p. 516).

[27] Our court has previously determined that "because there is no complex scientific process necessary to obtain a measurement of distance as distance can be measured with a yard stick or even a tape measure," the State need only "show that the measuring device was accurate and was operated correctly in

order to allow the admission of the distance as evidence." *Charley*, 651 N.E.2d at 303. Technician Strine testified that he used the aerial imagery and ArcMap software to calculate the distances, and that he relied upon his years of training and experience to pinpoint the correct locations. In addition, he explained to the jury that the company who provides the County with the aerial images warrants the accuracy of the GPS location of each pixel to within two and one-half feet. As such, Technician Strine testified that his distance measurements were correct within a five-foot margin of error, and the determination of accuracy is ultimately a question for the trier of fact. *See id.*

[28] In general, evidence is admissible if it is relevant. Ind. Evidence Rule 402. Relevant evidence is that which "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Evid. R. 401. Even if relevant, the trial court may nevertheless exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Evid. R. 403. Here, the Terms and Conditions do not apply to Technician Strine's measurements because he is not a member of the general public accessing the Beacon website, nor did he even access the Beacon website to make his calculations. Furthermore, Technician Strine calculated the distances specifically for the purposes of Davis' trial; these measurements are not available on the Beacon website. The aerial photography company warrants the accuracy of its data *to* the County—not to a general user of the Beacon

website who accesses a copy of the aerial image. Similarly, a user who independently makes a calculation from the aerial images does not receive the warning about the five-foot margin of error because Technician Strine only makes that representation when he completes a requested calculation. Accordingly, we find that any relevancy in the Terms and Conditions as it purports to challenge the accuracy of the aerial imagery upon which Technician Strine relied is far outweighed by the likelihood that its admission would simply mislead the jury. Therefore, we cannot say that the trial court abused its discretion by excluding the Terms and Conditions from evidence.

### III. *Appropriateness of Sentence*

Lastly, Davis claims that his sentence is inappropriate. The trial court imposed the maximum sentence of fifty years for a Class A felony, to be fully executed in the DOC. I.C. § 35-50-2-4 (2013). Even where a trial court has imposed a sentence that is authorized by statute, our court, "after due consideration of the trial court's decision," may nevertheless revise the sentence if we find that it "is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). Whether we determine that a sentence is appropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). On review, we focus on the length of the aggregate sentence and how it is to be served. *Id.* Ultimately, our goal is "to attempt to leaven the outliers[] and identify some guiding principles for trial courts and those charged with

improvement of the sentencing statutes, . . . not to achieve a perceived 'correct' result in each case." *Id.*

[30] Looking first to the nature of the offense, we find that Davis was manufacturing methamphetamine every day for nearly five months in the home that he shared with his wife (*i.e.*, Beougher), Beougher's child, and Lesh. He relied upon his methamphetamine-addicted friends to supply him with ingredients in exchange for the finished product. Manufacturing methamphetamine is a notoriously dangerous activity. The combination of toxic chemicals is unsafe to breathe, and the volatile nature of the ingredients creates a serious risk of a massive explosion. Yet, Davis chose to manufacture methamphetamine on a daily basis notwithstanding the fact that he jeopardized numerous human lives each time he did so. At the time the police officers arrived to execute the arrest warrant, there were nine other people in the house, including Davis' wife and two young children. The fact that the officers recovered two gas masks from the second floor of the house clearly indicates that Davis was aware of the dangers of inhaling the methamphetamine fumes, but his manufacturing process was seemingly undeterred by the two toddlers asleep in the living room. It is apparent that Davis' priority was just to feed his own addiction and his friends' addictions without regard for the consequences.

[31] As to his character, the record reveals that Davis began using illicit drugs at age fourteen, and was using methamphetamine by age twenty-one. Between the ages of nineteen and thirty-four, Davis accumulated a significant criminal history, including six felony and three misdemeanor convictions. His criminal

resume includes convictions for burglary, theft, forgery, auto theft, possession of marijuana and methamphetamine, and obtaining a controlled substance by fraud or deceit. Thus, Davis' prior incarcerations have clearly been insufficient to deter him from future criminal conduct. Moreover, Davis has demonstrated disrespect for the authority of the courts and has rejected the opportunity for rehabilitation—as evidenced by the fact that his probation was revoked on five separate occasions, and he failed to successfully complete a drug court program. At the time of the instant offense, Davis was on probation and had not even been released from the DOC for a year. Davis is the biological father of one child. Instead of striving to set a good example for his son and ensuring his ability to provide support and guidance for his son, Davis rejected prior opportunities for rehabilitation and chose to maintain his criminal lifestyle. We cannot say that his sentence is inappropriate.

## CONCLUSION

[32] Based on the foregoing, we conclude that the trial court acted within its discretion in declining to give Davis' proffered jury instruction on lesser-included offenses and in excluding the Beacon website's Terms and Conditions from evidence. We further conclude that Davis' sentence is appropriate in light of the nature of the offense and his character.

[33] Affirmed.

[34] Bailey, J. and Barnes, J. concur